CITY OF ASBURY PARK, A MUNICIPAL CORPORATION
OF THE STATE OF NEW JERSEY, APPELLANT, v. THE
DEPARTMENT OF CIVIL SERVICE OF THE STATE OF
NEW JERSEY, AND CECIL REED, RESPONDENTS.

Argued January 24, 1955—Decided February 14, 1955

Mr. *Sidney J. Meistrich* argued the cause for appellant.

Mr. *William J. O'Hagan* argued the cause for respondent Reed (*Messrs. Stout and O'Hagan* and Mr. *Merrill Richardson,* attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. After a hearing on charges, the City Manager of Asbury Park suspended Cecil Reed, a policeman, for six months without pay for conduct unbecoming a police officer. Reed appealed to the Civil Service Commission which heard the matter *de novo* and reversed the action. The case is here on certification on our own motion of the city's appeal to the Appellate Division.

Part of the testimony before the Civil Service Commission was heard by one member and part by two other members. The city's principal witnesses, two girls, Dianne Walker and Arlene Hankinson, both 18 when Reed was involved with them, were heard on May 11, 1954 by the commission's president, William F. Kelly, Jr., to accommodate the city which desired to complete the girls' testimony before they were sentenced on May 14 upon indictments for

prostitution and adultery to which they had pleaded guilty. The testimony of the other witnesses, one for the city and seven, including Reed himself, for Reed, was heard on June 24, 1954 by Commissioners James I. Bowers and Edward M. Gilroy.

We are aware of no authority which sanctions the hearing of part of a disciplinary appeal before some members and part before other members of the commission. The general rule governing the hearing and decision of disciplinary matters by boards or commissions, founded upon considerations of the fundamentals of fair play, is "that fairness and impartiality can only be assured when the members participating in the deliberations and decision of the board or commission, following a hearing on employee performance, have had an equal opportunity to hear and evaluate all of the evidence presented at the hearing." *McAlpine v. Garfield Water Commission*, 135 *N. J. L.* 497, 500, 171 *A. L. R.* 172, 174 (*E. & A.* 1947).

 This is a case arising in the municipal rather than in the state service. *R. S.* 11:25–2 suggests that Civil Service Commission hearings in municipal disciplinary cases such as this should be heard by the full commission, or at least by a quorum constituted as provided by *R. S.* 11:1–10. If, however, *R. S.* 11:2A–1 allowed this suspended municipal employee an appeal to be processed according to the procedure laid down for such appeals in the state service, *Weaver v. New Jersey Dept. of Civil Service*, 6 *N. J.* 553 (1951), the practice followed here is not sanctioned under *R. S.* 11:15–4 providing that the Commission in state service cases may "hear * * * sitting as a body or through one or more of its members." See also *R. S.* 11:5–1(d). This merely means that one or some of the members may be designated to hear and decide the appeal for the full commission, but only those designated who hear the whole of the case may participate in the decision; this statute is not like some under which one or more of the members of a commission or board merely take the testimony, and the determination is made by the full body upon the report of those members. *Jersey City v.*

*Hudson County Board of Taxation*, 130 *N. J. L.* 309 (*Sup. Ct.* 1943).

The decision of the commission in the instant matter turned entirely on the credibility of the witnesses. The testimony of the two girls was disbelieved—"It is our observation that the worth of their testimony is almost totally impaired and that little or no credibility can be given to their version of what transpired"—and Reed's version of the events was found to be the true one, largely because those witnesses who corroborated Reed were also believed. Yet only the commission's president heard the girls testify and Commissioners Bowers and Gilroy, without the president, heard Reed and his corroborating witnesses. No one would doubt the invalidity of a jury verdict if half the jury heard only the plaintiff's witnesses and the other half heard only the testimony on behalf of the defendant. Fair play is plainly denied to litigants when a trier of fact who has not heard and evaluated all the testimony influences the decision by his participation in the deliberations by which it is reached. The members of the commission designated to hear and decide appeals of the instant class constitute the collective finder of fact and any one of those designated who has not heard all the testimony in a given case "occupies no legal status as arbiter or judge to adjudicate upon the cause." *Eisberg v. Borough of Cliffside Park*, 92 *N. J. L.* 321, 322 (*Sup. Ct.* 1919); *Kelly v. Bishop*, 119 *A.* 6 (*Sup. Ct.* 1922) (not in state reports); *Long v. Daly*, 105 *N. J. L.* 492 (*E. & A.* 1929), affirming 6 *N. J. Misc.* 495 (*Sup. Ct.* 1928). Since none of the three commissioners who participated in this case heard all of the testimony, it follows that the commission's decision is a nullity.

The city does not urge this infirmity in the decision as a point for reversal. But the defect is nevertheless vital, and cannot go unnoticed. In these circumstances, an independent determination by us under our power to make new or amended findings of fact to effect a complete determination of the cause is appropriate. *R. R.* 1:5–4(*b*); *N. J. Const.* 1947, *Art.* VI, *Sec.* V, *par.* 3.

The charges grew out of certain happenings after three o'clock of a Sunday morning, August 19, 1953, on police post 5 where Reed and another officer, Robert Tyler, were assigned as a team to foot patrol. The principal thoroughfare on the post is Springwood Avenue. From the record, it is an understatement to say that conditions along that street are appalling. Reed testified that it was a "rough neighborhood," "anything can happen on Springwood Avenue—murder, rape, robbery," "This is the only post that has two officers assigned"; there was "much trouble" always on the street, particularly after the numerous bars close (he said there are "10 bars on the beat"); "around 3 o'clock" Sunday mornings after Saturday night revels "there are a lot of drunks walking on the street," and "some fellows hanging around seeing what they could pick up." Two hours earlier Tyler arrested a man who was beating a woman companion. Reed's explanation for his actions with the two girls that night was that he became solicitous for their safety when some men in a car spotted him and Tyler talking with the girls in front of 1128 Springwood Avenue and "kinda lagged back to see what was going on" and, bent on picking them up, made a "U" turn at Sylvan and Springwood, although this was a violation of a traffic ordinance; the girls were "pretty high" and Reed says he "suggested to Officer Tyler that we better see the girls home to protect them from harm."

It is in this tinder box setting of imminent violence on a Saturday night, at its most inflammable and boisterous hour, after the bars close, that Reed asks us to believe that he and Tyler had gone to the third-floor apartment of one Benefield at 1128 Springwood Avenue because, after dispersing "some fellows in the hallway there," he "heard music" upstairs and, although no one had complained of noise (and any such complaint would have been ironic in that setting), the two went to the Benefield apartment "to stop the noise," "I suggested to Mr. Benefield that it was a late hour and asked him to break up the party." Yet, according to Reed, there was nothing else objectionable about the party. There were "10 or 12 people" there sitting around talking and he

"didn't see anybody drinking." Tyler was more observant. He said, "Mr. Benefield had a table and some chairs and some of them were sitting around drinking." Benefield himself said, "We were having a party," that most of the guests "started coming in" "at 1:30 in the morning," that while he had lived there more than five months this was "a housewarming party" although his wife did not attend it—"She was up front lying down as much as possible." The apartment was a railroad flat with the living room facing on the street and, toward the rear, past a bedroom, was the room where the party was held. He kept a record player in the front living room and had attached a loud speaker to it by a wire "that runs back to the fourth room." Benefield thought there were 12 or 15 at the party, but he could remember the names of not more than four because "it wasn't a written invitation affair" and he had forgotten his guest list. He served everybody drinks from a "makeshift" bar—"one of these clothes wardrobes turned on its side, an old dresser with a piece of dime store red plastic thrown over it."

The two girls were there, but, said Benefield, not as invited guests to the party; "They came up voluntarily. I don't know why." He said, "It has been my contention that they came up to see me about getting a friend out of jail," but he admitted neither of them said anything at all about that while they were there. The "friend" was one Montgomery, whose "girl friend" was Dianne Walker. Montgomery and one Purcell Evans had been arrested on Saturday afternoon for fighting in a Springwood Avenue bar (where the two girls were at the time) and were in jail awaiting arraignment.

The girls had been to the Benefield apartment on a previous night. Officer Tyler knew the girls and had also been there on a previous occasion. Reed testified that this was the first time he, Reed, met the girls; but it does not appear whether this was his first visit to the apartment.

A flashback to Saturday noon is necessary to pick up and follow the trail which led the girls to the Benefield apartment. At this juncture it is appropriate to note that the crimes of prostitution and adultery to which they confessed

guilt in no wise involved Officers Reed or Tyler. The offenses were committed in other municipalities on earlier dates. One of the 11 charges against Officer Reed included a charge of alleged immoral and indecent conduct with the Hankinson girl, but that charge was withdrawn by the city at the hearing before the Civil Service Commission.

The girls began the rounds of the Springwood Avenue bars at noon. They had falsified their ages as 22 when they obtained learner's driving permits from a motor vehicle agency in order to give them evidence that they were not minors when buying drinks. They first went to Cuba's where they met Montgomery and "had a few drinks." It was there that Montgomery had the fight with Evans which resulted in the arrest of both. After this a friend of Montgomery, one White, drove the girls to the Turf Club where they had more drinks. At the Turf Club they met another man "who said he was a detective" and who drove them to the Bradley Beach Post Office where they withdrew $185 from a postal savings account. They next repaired to Belmont Inn, outside of Asbury Park, where they stayed until nine o'clock that evening when they telephoned Montgomery's friend White, who came for them and drove them to the Waverly Motel, on Reed's post 5 at DeWitt Avenue, where White rented a room for them. White obtained a bottle of whiskey and the three drank it, after which White fell asleep on one of the beds.

By this time it was after closing time for bars, and the girls decided to walk to "an after-hours place on Springwood Avenue." En route (and, significantly, Officer Tyler did not deny this when he testified) they met Tyler who asked them "Where are you going?," and they responded "down the street." The girls went to Benefield's apartment, where they had been before, and which they said was "the after hours place," "an unlicensed place." They testified that they bought drinks from Benefield, "whiskey" at "eighty cents" per drink, and that they saw others do the same.

When the two officers came to the Benefield apartment, according to the girls, they joined them at a table. An "exgirl friend" of Montgomery's who was there started an

argument with the Walker girl, and Reed, according to her, "took me by the arm and said 'Come on, let's go.'" The two officers and the two girls left.

Reed's and Tyler's version is that when they reached the apartment to have the music stopped, Benefield expressed delight at seeing them because the girls were making trouble at his party and he wanted them to go. The officers admit that neither girl was causing any trouble that they could see, but say they complied with Benefield's request nevertheless.

When the four came downstairs to the street, the girls, by their own admission, were drunk, or, as Reed put it, "they were very high, at a point of drunkenness." The versions of the girls and of the officers as to what happened after that point are in sharp disagreement. Officer Reed had his own car, a Lincoln, parked across the street. The girls said that Officer Reed and the Walker girl paired off in the front of the car and Officer Tyler and the Hankinson girl in the back; that they drove to a back street and parked and drank beer which the officers obtained, and later drove off post 5 and parked in front of the Bangs Avenue School. At the latter place Tyler raised the matter of having Montgomery released from jail if the girls would provide the money for the purpose. The four next went to the girls' room at the motel where they found White still asleep on one of the beds. A discussion of Montgomery's release began again and the Walker girl gave Tyler $100 to arrange the release. The officers then went out and obtained breakfast for the four, after which the officers left saying that "they'd be back about ten the next morning with Billy" (Montgomery). Later the girls went back down Springwood Avenue looking for the officers, and got the money back from Tyler. Some time thereafter Officer Reed was given the money when he and Tyler came back to the motel and expressed resentment that the girls did not trust them.

The officers, on the other hand, say that what they did was done for the single purpose of preventing harm coming to the girls in their drunken condition in this tough neighborhood, particularly because of the interest in the girls displayed

by the men in the automobile already mentioned and the receptive attitude of the girls toward those men. They say that they first tried to get a taxicab, but finding none decided the best thing to do in the circumstances was to drive the girls directly to the motel in Reed's car. They deny having stopped anywhere enroute. They admit going into the motel and seeing White asleep on the bed. Reed says he saw nothing unusual in White's presence or any danger to the girls because of it since the Hankinson girl said "That's my old man, leave him alone," and from that he assumed "That he was her husband." Reed says that the matter of Montgomery's release was first raised at the motel when the girls asked him "to bring some money down to the Walker girl's boy friend who was lodged in the police jail." He says he acquiesced only upon their promise to "stay in the motel" because "I thought it best to keep them over there for their own safety." Reed and Tyler deny that the girls gave either of them any money at that time, or that Tyler ever had the money at any time. Reed says that, honoring his promise, he returned to the motel just before the end of his shift at eight o'clock and that the Walker girl gave him $100 then. He says he had to be in police court in any event to testify in another case, that while there he heard Montgomery and Evans tried and fined $25.00 each. He says he then went to Montgomery and told him he had $100 for him, but that Montgomery said he wanted only $50 to pay both his own and Evans' fines.

He then drove Montgomery and Evans to the motel and in their presence and in the presence of Tyler offered the remaining $50 to the Walker girl who refused it and told him to keep it for doing the favor. He said, "No, we couldn't accept money," and when she would not take it he gave the money to Montgomery. Montgomery, Evans and Tyler tell the same story.

The key to the truth in this tawdry business lies in the answer to the question why Reed and Tyler went to the Benefield apartment. The stated reason, to quiet the music, is preposterous on the face of it and we find as a fact that

this was not the reason. Tyler's failure to deny the Walker girl's assertion that she met him before going to the "after hours" place and told him they were going "down the street" reveals why the officers went there. The contradictions in the Walker girl's story on cross-examination and the sordid lives the girls led are proper reasons for looking with suspicion upon their credibility. They are not reasons, however, for discarding as untrue what stands corroborated out of the mouths of Reed and his witnesses from their own evasions and untruths and the failure of Tyler to deny the conversation between him and the Walker girl before the girls went to Benefield's. Tyler knew the girls and he knew Benefield's place. We find that Tyler and his partner Reed went to Benefield's, not on police business, but on a personal mission, to see the girls.

The principal charge against Reed is misconduct unbecoming an officer. Other charges relate to violations of specified police department rules and regulations in the failure to keep a proper memorandum of or to file a written report of the events of the night (his report on the happenings on his shift that night was "Routine—Post 5"), and in the use of his personal automobile; also charges of inattention to duty in the failure to investigate the girls as vagrants, failure to investigate and report the sale of liquor at Benefield's in violation of law, and a failure "to properly patrol his post."

 The finding of misconduct need not be predicated upon the violation of any particular regulation or rule. The fundamental duty of a policeman "from chief of police to patrolman, is to be on the lookout for infractions of the law and to use due diligence in discovering and reporting them, and in a proper case arresting the perpetrator and lodging and prosecuting a proper complaint," *State v. Donovan*, 132 *N. J. L.* 319, 321 (*Sup. Ct.* 1945). In the circumstances known to Reed, after 12 years on the post, customarily to prevail on Springwood Avenue on a summer Saturday night, the obvious demand upon him was for heightened vigilance and continuous presence on the scene where danger threatened. On the contrary, his conduct indicates an attitude of mind

and approach to the obligations of his office fundamentally at variance with his sworn duty. We may accept his protestation that his concern was for the girls, but not that the concern was about the harm that might befall them if he did not take them to the motel. There was evidence all about him sufficient to suggest infractions of the law and to prompt him to make an inquiry if he were intent upon doing his duty. Yet, not only did he not investigate the plainly suspicious circumstances at Benefield's and elsewhere, he ignored the only actual threat to the girls' safety which occurred in his presence and neither warned away the men eyeing the girls from the automobile nor gave the driver a traffic ticket when he violated the "U" turn ordinance. And his willingness to serve as a messenger to carry $100 to an inmate in the local jail itself creates a serious question that he had any real concept of his duty and casts grave doubt upon his fitness to discharge his important responsibility. His view that the happenings of this night were merely routine and required no special report in compliance with the rules shows either that he was conscious that he and Tyler were doing wrong in leaving the neighborhood with the girls at this particularly dangerous time of the week or that he so far lacks an appreciation of his duty as to make him incapable of rendering the service required by his oath. Nor can his conduct be justified by cynicism that "anything can happen" on Springwood Avenue; if failures of duty by others charged with law enforcement are indicated, that fact cannot excuse him for the obvious dereliction of his own duty shown by this record.

Reversed, with direction to reinstate the action of the city manager in suspending Reed for six months without pay from September 3, 1953.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.