40 N.J. Super. 12 (1956)
122 A.2d 7
FIFTH STREET PIER CORPORATION, PLAINTIFF-APPELLANT AND AS RESPONDENT-APPELLANT,
v.
CITY OF HOBOKEN, A MUNICIPAL CORPORATION, RESPONDENT-RESPONDENT AND AS PLAINTIFF-RESPONDENT, AND DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 1956.
Decided April 2, 1956.
*13 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Raymond J. Lamb argued the cause for Fifth Street Pier Corporation (Messrs. Emory, Langan & Lamb, attorneys).
Mr. Herbert H. Fine argued the cause for City of Hoboken.
Mr. John F. Crane argued the cause for Division of Tax Appeals (Mr. Grover C. Richman, Jr., Attorney-General; Mr. David D. Furman on the brief).
The opinion of the court was delivered by CLAPP, S.J.A.D.
These consolidated appeals bring before the court 26 judgments of the Division of Tax Appeals. The judgments deal with assessments of the City of Hoboken levied for the years 1948 through 1953 on properties known as the Fifth Street Pier and the Sixth Street Pier, which are owned by the appellant, Fifth Street Pier Corporation, a subsidiary of the Holland-America Line.
*14 Appellant's first point is that the Division so conducted the proceedings in these cases that there was a denial of due process. This calls for a study of the procedure prescribed by N.J.S.A. 54:2-18:
"The Division of Tax Appeals in the State Department of Taxation and Finance may, as occasion shall require, by order, refer to two or more of its members, at least one of whom shall be an attorney-at-law, the duty of taking testimony in a matter pending before it, and to report on such matter and the testimony so taken, to the division, but no determination shall be made therein except by the division. Said reports shall be in writing and signed by the members, and shall include, in substance, the facts and particulars of the testimony so taken, which written reports shall be public records and open to the inspection of the public. Stenographic notes shall be made of all testimony so taken, but the members of the board [sic] shall be qualified to make their determination after receiving the report of the members hearing the testimony, and without the necessity that the stenographic notes so taken shall have been reduced to writing; provided, however, that the testimony shall be reduced to writing at the request of any member of the division required to make a determination in any such matter."
On December 9, 1952, pursuant to this statute, the Division referred the cases involving the years 1948 through 1951 to two of its members, who took testimony as to the same between January and October 1953 for a total of 19 days. The testimony covers at least 2,532 typewritten pages; only two copies were written up. At some point in the proceedings the parties by stipulation left it to this panel to make determinations also as to the years 1952 and 1953. Briefs were submitted to the panel by June 1954; and a very comprehensive report of 145 printed pages had been completed by March 15, 1955, and copies were then transmitted to the other members of the Division. On April 7, 1955 the panel report was put on file, and on the same day six members of the Division (including the two who comprised the panel) unanimously adopted it as the action of the Division. Judgments were signed April 29, 1955, and the report was thereafter "furnished to the appellant." N.J.S.A. 54:2-16.
The argument that this procedure is unconstitutional rests chiefly on Mazza v. Cavicchia, 15 N.J. 498 (1954). However, *15 there are three major distinctions between the practice of the Division of Alcoholic Beverage Control held unconstitutional there and that provided for in N.J.S.A. 54:2-18. In the first place, the report made by the hearer under the alcoholic beverage control practice was a secret document, In re Erie Railroad System, 19 N.J. 110, 125 (1955); and an appellant could never know whether it dealt with matters outside the record. On the other hand, the panel report called for by N.J.S.A. 54:2-18 is required by that statute to be made public; error and impropriety therein, if there be any, must be exposed. This is not the case in which to consider what remedies are available to a litigant in the event of such exposures. Nor need we stop to decide whether N.J.S.A. 54:2-18 requires the report to be made public promptly after it is prepared (that is, in this case at least by March 15, 1955).
Second, under the practice condemned by Mazza, the hearer was a subordinate; whereas in this case the two hearers were members of the Division. In re Erie Railroad System, supra. It may be said that members of the Division would be more likely to bow, without adequate study, to a report from two colleagues, than they would to the report of a subordinate. On the other hand, offsetting that, is the fact that those comprising the panel, by virtue of their very appointments to the Division, are entrusted by law with a fraction of the decisional power.
Third, the practice of the Division of Alcoholic Beverage Control was aggravated by the concentration, in the agency, of the functions of prosecutor as well as judge, Mazza, 15 N.J., at page 523; whereas the Division of Tax Appeals is entirely impartial in its function.
Brushing these distinctions aside, appellant seems to rest its argument on two other factors. In the first place, appellant's argument depends on the fact that the panel report  which "obviously played a" leading "part in the decision in this case"  was neither "known to the parties" prior to its adoption, nor "subject to being controverted" before the entire Division prior thereto; indeed that no opportunity *16 was afforded the litigants to "supplement, explain, and" refute it in any way. See Mazza, 15 N.J., at pages 515, 516. The practice in this regard is the same as that condemned in Mazza.
In the second place, appellant's argument depends on the provisions of the statute making it unnecessary to transcribe the testimony and therefore leaving it to the Division whether or not to read it. In this respect the contention goes beyond Mazza; for there the Director had read the transcript. Respondents in an attempt to meet this contention point out that in each of the 26 judgments appealed from, there appears a recital, in substance, as follows:
"After hearing the evidence and the arguments of the attorneys for appellant and respondent, and after considering the same, it is hereby ordered, adjudged," etc. (Italics added.)
Respondents, relying upon a presumption of regularity that is said to attend every administrative action, claim we must take these recitals to be true. Annotation, 18 A.L.R.2d 606, 625, 626 collects some of the cases. Of course only the two members of the panel personally listened to the evidence. However it may be asked, did the four members of the Division not on the panel, who adopted the report 23 days after it was mailed to them, hear-by-reading? Did they actually read one of the two copies of the testimony (some 2,532 typewritten pages long) and the extensive exhibits (over 100 printed pages), as well as the report (145 printed pages)? We do not know, and we think (as will appear) that we need not decide the matter. They certainly did not hear arguments of the attorneys (as stated in the recitals of the judgment), except as the arguments are indicated in the panel report. A good deal has been written on what constitutes a "hearing" of evidence and arguments in this connection. See e.g., Cooper v. State Board of Medical Examiners, 35 Cal.2d 242, 217 P.2d 630, 632, 633, 637, 638 (Sup. Ct. 1950); Davis, Administrative Law 332 (1951). But we need not go into the matter here.
*17 The statutory provision dispensing with the transcription of the testimony should be considered in connection with the explicit provisions of N.J.S.A. 54:2-18 calling upon the panel to report not only on the "matter," but also (note the amendment in the statute made by L. 1946, c. 161) on "the testimony so taken," including, "in substance, the facts and particulars of the testimony." Even more significant is this provision of the statute:
"* * * the members of the board shall be qualified to make their determination after receiving the report of the members hearing the testimony, and without the necessity that the stenographic notes so taken shall have been reduced to writing." (Italics added.)
It is interesting also to note the statement appended to the bill dispensing with the writing up of the testimony (this bill was enacted as L. 1941, c. 143, amending N.J.S.A. 54:2-18):
"The purpose of this bill is to relieve the board of the necessity of ordering testimony reduced to writing in every case before it, as a condition of the legality of judgments in cases heard by one or more members, but less than the entire board. Such necessity has been adjudicated by the courts under the sections in question. The cost of such testimony would, of itself, exceed the present full annual budget of the board, since upwards of 20,000 appeals are filed annually with the board."
The question, then, which appellant puts before us is whether the procedure followed here is unconstitutional because of the two points stated: first, no opportunity was afforded appellant to controvert the panel's report; and, second, the other members of the Division were not required to and, it is claimed, did not read the testimony and exhibits.
We think it clear that the Division might have been authorized by statute to "hear * * * through one or more of its members," cf. N.J.S.A. 11:15-4; and that under such a statute the member or members so designated not only could hear but also could decide the appeal for the full Division. City of Asbury Park v. Department of Civil *18 Service, 17 N.J. 419, 422 (1955). If it is constitutional for the Legislature to empower a panel to make a decision for the Division, why is it not constitutional for the Legislature to empower the Division to make the decision on the basis merely of a study of a panel's recommendation, including a report on the particulars of the evidence? We think it is, at least in a case such as this, where the Division adopts the panel report. See In re Erie Railroad System, 19 N.J. 110, 125 (1955); Davis, supra, 350, 351, and in general 330-364; in general, see also Benjamin, Administrative Adjudication in New York, 221-251 (1942); cf. Jersey City v. Hudson County Board of Taxation, 130 N.J.L. 309, 312 (Sup. Ct. 1943); Pennsylvania R. Co. v. New Jersey State Aviation Comm., 2 N.J. 64, 72 (1949); Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129, 1132 (1938).
Under N.J.S.A. 54:2-18, as we read it, the panel is authorized to advise as well as to report. It might be observed that under our former Chancery practice, where a decree was advised by a master to advise (to be distinguished from a master to report), it would hardly have been contended that due process was denied where the Chancellor signed the decree without reading the testimony or affording the litigants an opportunity to take exceptions. See Practical Bldg. & Loan Ass'n of City of Newark v. Meisol, 101 N.J. Eq. 636, 643 (Ch. 1927). We put no stress upon the analogy, but practices arising out of exigencies such as these, may serve at least to point to the minimal components of due process. Here, somewhat similarly, the Division makes the determination (as required by N.J.S.A. 54:2-18); but in our opinion (as stated), it has the power to take the panel's advice without hearing exceptions or reading the testimony.
Had we any doubt on the point, we still must affirm, for it is elementary that a legislative act will not be declared unconstitutional unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. Behnke v. New Jersey Highway Authority, 13 N.J. 14, 25 (1953).
*19 There is a serious question whether it would be constitutional for the Division to reverse or substantially modify the panel report in a case where the testimony is not written up, and no opportunity is afforded the litigants to be heard before the full Division. However we need not consider that question here, though we might refer, in passing, to the California practice. There, where commissioners comprising an agency refer a case to a hearing officer, he must prepare a proposed decision, and the commissioners may adopt it without reviewing the evidence; but if his proposed decision is not adopted, then they are required to make an independent examination of the record and to hear either oral or written argument. Pacific Indemnity Co. v. Industrial Accident Comm., 28 Cal.2d 329, 170 P.2d 18, 24 (Sup. Ct. 1946); Hohreiter v. Garrison, 81 Cal. App.2d 384, 184 P.2d 323, 331 (D. Ct. App. 1947); Annotation, 18 A.L.R.2d 606, 623; Cal. Gov. Code § 11517 (as amended L. 1955, c. 1661, § 1); Davis, supra, 341, 364. Of course, where those who are to decide have neither heard nor read the evidence, the usual administrative procedure act offers the litigants an opportunity to submit exceptions. See e.g., Model State Administrative Procedure Act, approved by the National Conference of Commissioners on Uniform State Laws, § 10; Federal Administrative Procedure Act, 5 U.S.C.A. § 1007; Burns' Indiana Stat. Ann., § 63-3012 (1951); Missouri, Vernon's Ann. Stat., § 536.080 (1949); Baldwin's Ohio Rev. Code, § 119.09 (1953); Wis. Stat., § 227.12 (1953); cf. N.J. Senate No. 42 (1956), § 22.
We have found no cases opposed to our conclusion above stated. In Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), the recommendation of the hearing agency was secret and moreover that agency was separated from the decisional agency; this is quite different from the procedure we are considering. As for Horsman Dolls, Inc., v. State Unemployment, etc., Comm., 134 N.J.L. 77, 81 (E. & A. 1946), it is also to be observed that the court there was not dealing with a procedure such as that before us. The same thing may be said of other cases. State ex *20 rel. Madison Airport Co. v. Wrabetz, 231 Wis. 147, 285 N.W. 504, 507 (Sup. Ct. 1939); see Weekes v. O'Connell, 304 N.Y. 259, 107 N.E.2d 290, 293 (Ct. App. 1952); but see to the contrary Elite Dairy Products v. Ten Eyck, 271 N.Y. 488, 3 N.E.2d 606, 610 (Ct. App. 1936); Berg v. Industrial Commission, 236 Wis. 172, 294 N.W. 506, 510 (Sup. Ct. 1940); cf. National Labor Relations Board v. Baldwin Locomotive Works, 128 F.2d 39, 46, 47, but cf. 65 (3 Cir. 1942); Magnolia Petroleum Co. v. Railroad Commission, 127 S.W.2d 230, 234 (Tex. Civ. App. 1939).
Appellant cites City of Asbury Park v. Department of Civil Service, 17 N.J. 419, 423 (1955). But that case is distinguishable. There one of the members of the Civil Service Commission  the members together constituted the collective finder of fact  heard part of the testimony and others heard another part; no consideration was given as to what would be the effect of a statute authorizing a report from the first member. For cases somewhat comparable, see City of Passaic v. Passaic County Bd. of Taxation, 18 N.J. 371, 397 (1955); McAlpine v. Garfield Water Commission, 135 N.J.L. 497 (E. & A. 1947); Redcay v. State Board of Education, 128 N.J.L. 281, 285 (Sup. Ct. 1942); cf. Inhabitants of Oxford v. Delaware, L. & W.R. Co., 64 N.J.L. 195 (Sup. Ct. 1899); Morgan v. United States, 298 U.S. 468, 482, 56 S.Ct. 906, 80 L.Ed. 1288, 1295 (1935). Contra, see Davis, supra, 337, 338; Benjamin, supra, 240-251; and Jaffe, Administrative Procedure Reexamined: The Benjamin Report, 56 Harv. L. Rev. 704, 721, 722 (1943). For cases in other jurisdictions pro and con, see 18 A.L.R.2d 606, 610 et seq., and supplemental service.
We conclude then that there was no denial of due process below. This brings us to appellant's second point which deals with factual questions involved in the valuation of the piers. By way of introduction  five pages of it  appellant presents us with a sombre vignette, commencing "The magnificent Port of New York is slowly dying." For the most part, there is nothing in the record to support these pages.
*21 Appellant's initial factual attack is directed at the testimony of Hoboken's two expert witnesses, principally one of them; the charge is that it is not credible. The panel report had this to say of that witness:
"* * * of all the experts, [his] testimony * * * made the strongest impression upon the panel."
The appellant's challenge is detailed and in part brought together in a chart, but we find ourselves quite unpersuaded.
Next, appellant deals with the purchase in April 1947 by Holland-America for $2,147,500 of the very properties before us  that is, all of them except the comparatively small properties acquired by appellant in subsequent years. The city's assessed valuations of all those properties (including the subsequent acquisitions) ranged from $1,550,200 in 1948 to $1,626,800 in 1953. These assessments were reduced to a certain extent by the county board of taxation, but the State Division in the judgments appealed from reinstated them.
Appellant, endeavoring to escape the strong probative effect of this purchase in 1947, claims that Holland-America was not a willing buyer in that transaction  that it was subject to economic compulsion. The panel report found on this point the following:
"Under the greater weight of the evidence in this case we find that the purchaser was subjected to only slight compulsion and that the sales [sale?] must be considered in that light. While we agree that the buyer could have paid more for these pier properties than would an outsider, we cannot agree that the evidence warrants a finding that the buyer had no alternative other than buying or abandoning its operations at these piers."
The proofs as to compulsion on Holland-America under the circumstances as they existed in 1947, are manifestly lacking in specificity. There was little before the Division except generalities (e.g., a general assertion as to a two-month survey), along with self-serving declarations that other piers suitable to Holland-America were not then available.
*22 It appears that at the time of the purchase, the seller gave Holland-America a choice of either leasing or buying. If the rental then proposed for that lease was in fact not excessive, it could not be said that the line was subjected to any compulsion to buy. It had leased the Fifth Street pier since 1910 and seems to have had a policy not to own real estate anywhere. With these considerations in view, Hoboken sought on cross-examination of certain of appellant's witnesses to find out just what were the terms of the lease then proposed. Indeed it went at the matter insistently on the second day of these hearings, and the point came up again in subsequent hearings. Notwithstanding Hoboken's strong challenge on this point, the appellant, though it had the burden of proof, never satisfactorily brought the facts out. Its failure to do so throws some doubt on its claim of compulsion  particularly in view of the fact that the case was prepared with much care and the trial extended over a considerable period of time after the initial challenge. We see no basis for asserting that the finding below on the matter of compulsion was erroneous.
Appellant's next point is that Hoboken's experts in making their evaluations were not justified in relying on the purchase price paid on the sale of the Eighth Street Pier property. Though one of appellant's own experts called it a "similar type property" except as to shape (that is, somewhat similar to the properties in question), nevertheless, appellant claims that the buyer here also was under compulsion. The sale was made in February 1948 (though it was recorded July 29, 1948) for $1,740,000 (or $1,800,000), which according to one of Hoboken's experts, was at the rate of $94,800 an acre for the land alone, after allowing for improvements. It is to be noted that this expert valued the land comprising the Fifth and Sixth Street Pier properties (after deducting therefrom the improvements) at $80,000 an acre, and at $93,300 an acre if account were taken merely of the purchase price paid by Holland-America  whereas the city's assessment of the same comes to about $74,000 an acre.
*23 The Eighth Street Pier property was bought 68% by the East Asiatic Steamship Company and 32% by John E. Johnson and his son, John H. Johnson. On the question of compulsion, it was found below:
"We conclude that East Asiatic was subjected to some compulsion, but that this compulsion was only slight and that the sale must be considered in that light. We conclude that from the evidence in this case the Johnsons were subjected to no compulsion."
East Asiatic had had no association with the Eighth Street Pier prior to the early part of 1946. We know it made some use of the pier between the early part of 1946 and July 1947, but we do not know the extent of the usage. In any event, in about May, June or July 1947 it rented the pier, taking, however, subject to an option in the lessor to cancel the lease on four months' notice. Apparently in November 1947 the lessor gave notice of its intention to exercise this option, the cancellation to become effective on March 31, 1948. Confronted with this situation, East Asiatic and the Johnsons bought the pier in February 1948. It is claimed by appellant that East Asiatic ascertained at that time that there was no pier available which suited their purposes. However, from the proofs submitted, it would seem that East Asiatic might have surmised when it took the lease, that its lessor was not interested in a permanent investment; and accordingly it might have anticipated that if the lessor could make a favorable sale, East Asiatic would find itself without a pier during the course of the term. That being so, there is less likelihood that it was entirely caught short by the exercise of the option and was thereby brought under the stress of an economic compulsion to buy.
In any event, we see no basis for upsetting the finding below, that East Asiatic was subject to only a slight compulsion to buy. As was stated with respect to Holland-America's purchase, there are conclusions of witnesses as to the matter of compulsion, but little in the way of convincing detail. As for the Johnsons, the finding below, *24 that they were subjected to no compulsion, must be sustained; there is nothing in the record warranting our interference here.
The findings made below give particular consideration to each of the sales of allegedly comparable properties used by the experts in making their evaluations. Appellant, in its brief, specifically attacks these and other findings, and Hoboken meets the attack point by point. However, there is no sufficient basis for action on our part here. See Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 104 (1952). Indeed, any further factual analysis by us of this long record is unwarranted.
We conclude that the judgments below should be affirmed.