**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1740-23

OFFICER DANIEL FUGNITTI,

    Plaintiff-Respondent,

v.

BOROUGH OF RIDGEFIELD,

    Defendant-Appellant.

_____

Argued October 17, 2024 – Decided October 25, 2024

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0734-22.

David F. Scheidel II, argued the cause for appellant (Keenan & Doris, LLC, attorneys; Thomas A. Keenan, of counsel; David F. Scheidel II, on the briefs).

Patrick P. Toscano, Jr., argued the cause for respondent (The Toscano Law Firm, LLC, attorneys; Patrick P. Toscano, Jr., of counsel; Matthew J. Toscano, on the brief).

PER CURIAM

Appellant Borough of Ridgefield appeals from a January 29, 2024 order entered by the Law Division, vacating a finding by a hearing officer recommending the termination of respondent Officer Daniel Fugnitti, and instead imposing a ninety-day suspension without pay. We reverse.

On May 29, 2020, Officer Fugnitti met K.L.[1] when police were called to a hotel regarding an issue with a payment voucher for K.L.'s room. Officer Fugnitti and other officers remained on scene for approximately one hour. Footage from Officer Fugnitti's vehicle showed that he and K.L. conversed about K.L.'s alcohol addiction treatment, places she had lived, and her prior employment.

That evening, K.L. received a text message from an unknown number, stating "good luck with the bed bu[g]s . . . just kidding. Did you get in ok[ay]?" This number was later revealed to be Officer Fugnitti's. K.L. and the officer continued to exchange numerous text messages, many of which were of a sexual nature.

Ridgewood Police Department video surveillance showed Officer Fugnitti leaving the police department at the end of his shift, at approximately 11:55 p.m. on May 29, 2020, in a white truck. Video surveillance from a lot adjacent to

---

[1] We utilize initials pursuant to Rule 1:38-3(a).

A-1740-23

K.L.'s hotel showed the same truck entering the hotel parking lot at 12:16 a.m. on May 30, 2020, and exiting at 1:19 a.m.

K.L. alleged Officer Fugnitti entered her room and "removed his clothes[,] . . . ripped her clothes off[,] . . . touched her breasts and vagina with his hands[,] and attempted to penetrate her vagina with his penis." She stated the officer eventually stopped, apologized, and left. However, the two continued communicating via telephone for the next few days.

On June 2, 2020, the Ridgefield Police responded to the hotel again after K.L. requested medical assistance following excessive alcohol consumption. Officer Fugnitti arrived as backup, but he did not interact with K.L. She did not appear to advise any police officers or the EMTs about the alleged assault a few days prior. When the matter was later investigated by the Bergen County Prosecutors Office (BCPO), K.L. said she reportedly told a female police officer "one of your boys raped me . . . ."

On June 5, 2020, police responded to the hotel after receiving a call from K.L.'s brother expressing concern for her well-being. K.L. was taken to a treatment center because she posed a danger to herself. Police recordings captured her advising officers there was "a dirty cop[] on [their] force . . . ." When asked if she knew the name of the officer, K.L. answered she did not. An

3

officer then asked if the officer in question had responded to her call two days ago, and she responded he did. K.L. did not say she was sexually assaulted.

On June 14, 2020, K.L. texted Officer Fugnitti stating, "[y]ou have been reported." Although she reported the sexual assault to the Ridgefield Police, she did not file a formal complaint.

The following day, she called the police, reported she was raped, and provided the telephone number belonging to the officer who assaulted her. That day, while investigating K.L.'s complaint, a Ridgefield Police Detective was at the hotel with K.L. when her telephone rang. When K.L. answered, the detective identified the caller's voice as Officer Fugnitti's. The same day, Officer Fugnitti's sister contacted a Ridgefield Police lieutenant, who was also a family friend, out of concern for Officer Fugnitti. The lieutenant in turn called Officer Fugnitti who told him he "f[***]ed up." However, Officer Fugnitti denied raping K.L.

On June 15, 2020, the Ridgefield detective investigating the matter contacted the Ridgefield Police Special Investigations Unit and stated K.L. reported she had been sexually assaulted by an officer. K.L. claimed the officer paid her $2,000 to keep her from reporting the incident. Footage from a lot

adjacent to the hotel showed Officer Fugnitti arriving on June 15, 2020, carrying a brown box into the hotel.

K.L. stated Officer Fugnitti called her and said he left something for her at the front desk. The item was a food container in a brown bag containing $2,000 in one-hundred-dollar bills. She took the money and later that day called the police to report the rape allegation. She consented to a search of her cell phone, which showed that between May 29, 2020, and June 16, 2020, she and Officer Fugnitti exchanged approximately 398 text messages.

On June 16, 2020, K.L. was transported to the BCPO for an interview but refused to speak with anyone other than the prosecutor himself. When she was informed that was not possible, she ended the interview before providing any details of the alleged sexual assault.

K.L. later spoke with BCPO Detective William Diedtrich, who prepared an internal affairs (IA) report. She reported the officer entered her room without permission, had non-consensual sexual contact with her, and she yelled "stop," "no," and "get off." She and the officer were in constant contact the day of the alleged assault and she reported the assault to police after he gave her the money.

In August 2020, Detective Diedtrich interviewed Officer Fugnitti following the officer's return from an alcohol treatment program. The officer

alleged K.L. invited him into her room on or around May 31, 2020. The two "began to kiss and remove each other's shirts and . . . touch." They performed oral sex on each other but did not engage in penetrative sex. He admitted she sent him the "[y]ou have been reported" text on June 14, 2020.

Officer Fugnitti stated K.L. said she needed to get to Florida, and if he gave her money, she would leave and not continue to press charges. He alleged she gave him detailed instructions of how to deliver the money, but after she received the money, she claimed she "changed her mind and that she was still going to report him. When he [later] called [K.L.] back, he heard members of the Ridgefield Police in the background."

The IA report concluded Officer Fugnitti's initial telephone contact with K.L. was "without invitation and did not appear to be consistent with the requirement that police officers of the bureau conduct themselves with high ethical standards both on and off duty." The officer's

> initial conversation with [K.L.] occurred while he was working and, by the nature and content of the conversation, it was obvious that the communication was purely for his personal benefit, not for the benefit of the Ridgefield Police Department or in furtherance of his official duties as a police officer.

The IA report found the officer failed to notify his department he was the victim of a crime, namely, K.L.'s attempt to extort him.

Pursuant to the IA investigation, the BCPO sustained three charges against Officer Fugnitti under the Ridgefield Borough Police Code.  It found he violated Chapter 75-22(A)(6) General Duties and Responsibilities, which provides that Borough officers "shall . . . [c]onduct themselves in accordance with high ethical standards, on and off duty."  The officer also violated the Rules of Conduct, by not reporting K.L.'s extortion.  Chapter 75-23(A)(4) prohibits the withholding of information and requires employees to "report any information concerning suspected criminal activity of others."  The third charge was that the officer violated Chapter 75-23(F)(3), which prohibits "[e]mployees who are on duty . . . from engaging [in] activities[] which are not directly related to the performance of their duty (e.g., sleeping, conducting private business or gambling)."  The BCPO recommended a ninety-day suspension without pay.

The Borough sent Officer Fugnitti a preliminary notice of disciplinary action, suspending him "without pay, pending a formal hearing to determine if termination is appropriate." (emphasis omitted).  Officer Fugnitti requested a hearing, which was conducted by a hearing officer.

The Borough called Detective Diedtrich.  He testified "Officer Fugnitti was very straightforward during the investigation and appeared credible . . . ."  There was not enough evidence to criminally charge the officer with rape.

7

However, the code violations were sustained because the officer admitted to contacting K.L., speaking with her, exchanging text messages, and paying her $2,000.

Detective Diedtrich explained the text Officer Fugnitti sent about the bedbugs, following the officer's response to the hotel, was inconsistent with the requirement that officers conduct themselves with high ethical standards on and off duty. The officer also failed to report that he was the victim of extortion. The texts and phone calls he exchanged with K.L. after the initial call for service also violated the prohibition on engaging in activities unrelated to the performance of the officer's duty.

The Borough called the police chief, who testified Officer Fugnitti should have reported the extortion. If the officer had properly reported the alleged sexual assault or the request for money, he could have been exonerated. The failure to do so affected the officer's future credibility and warranted termination.

The hearing officer found Officer Fugnitti violated the high ethical standards governing police officers. Although there was not anything improper about the officer's relationship with K.L., "the entire surroundings of the relationship reek[ed] of a lack of ethical behavior." This was compounded when

"in and around June 14 and 15, [the officer] found himself in difficulty again . . . [when K.L.] attempted to extort money from [him] . . . ."

The hearing officer addressed the Borough's request for termination by analyzing In re Carter, 191 N.J. 474 (2008), Board of Chosen Freeholders v. Miller, 145 N.J. Super. 222 (App. Div. 1976), and Borough of Park Ridge v. Salimone, 21 N.J. 28 (1956). He concluded that like these cases, the circumstance of Officer Fugnitti's case were "severe and warrant bypassing the principles of progressive discipline. . . . There are serious questions as to whether [Officer] Fugnitti could be trusted to properly report and investigate incidents which may involve him personally, including his own actions in investigating or reporting incidents." The hearing officer found the officer's "future employment with the Borough is compromised by not only his actions herein, but in the diminution of trust the Department has in him as a result of this situation." He concluded the facts "provide a basis for discipline by the Borough up through and including termination."

The Borough adopted the hearing officer's findings and sent Officer Fugnitti a notice terminating him effective January 24, 2022. It sought repayment of the $31,519.54 the officer received while on paid suspension from June 16, 2020 through December 14, 2020.

A-1740-23

In February 2022, Officer Fugnitti filed a complaint in lieu of prerogative writs challenging the hearing officer's recommendation and the Borough's termination decision. The Borough filed an answer and counterclaim, seeking reimbursement of the pay the officer received during his suspension. It subsequently moved for summary judgment. The trial court denied the motion and held a trial de novo on the record presented to the hearing officer.

Following the trial, the court issued a written opinion vacating Officer Fugnitti's termination and imposed the ninety-day suspension without pay recommended by the BCPO. The court found fault with five aspects of the hearing officer's findings: 1) the hearing officer did not address the fact the extortion took place after K.L. reported the alleged rape; 2) the BCPO made no attempt to locate K.L., presumably to testify at the hearing; 3) the allegations were "based in large part on [Officer Fugnitti's] own admissions;" 4) the hearing officer omitted Detective Diedtrich's testimony that he found Officer Fugnitti credible and forthcoming; 5) the BCPO was "the only neutral and ultimate decider in this matter," and the hearing officer ignored its recommendation of a ninety-day suspension, which "should [have been] given particular weight in [a] noncivil service police department[]."

A-1740-23

The trial court found the hearing officer wrongly disregarded progressive discipline as an appropriate measure of discipline and misapplied In re Carter, Miller, and Salimone. The court distinguished In re Carter from Officer Fugnitti's case because In re Carter "concerned a recidivist [p]olice [o]fficer . . . ." Miller was different because he lied during his disciplinary investigation. And Salimone was distinguishable because the officer there was indicted for a crime.

The court further found the Borough Chief's testimony did "not outweigh the meticulous investigation of the [BCPO,] which found the sexual relations were consensual and the extortion could be equally construed as go-away money in light of the fact that [K.L.] 'reported' Officer Fugnitti prior to his payment of money . . . ." The Chief did not consider that except for obtaining K.L.'s contact information, the officer's conduct occurred outside his employment. Further, the Chief's testimony did not "provide a basis for overriding the principle of progressive discipline."

The court concluded the hearing officer's decision was "arbitrary, unreasonable and capricious and not supported by the substantial credible evidence in the record." It characterized the termination as punishing "conduct consisting of essentially extra[]marital affairs . . . ." The court reasoned "this

'policy' should be codified so it is uniformly applied and no[t] used discriminately so all police officers are put on notice that extra marital affairs will be viewed as career ending."

## I.

Typically, our role in reviewing a de novo proceeding is limited. In re Phillips, 117 N.J. 567, 579 (1990). We "must ensure there is 'a residuum of legal and competent evidence in the record to support'" the court's decision. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 359 (2013) (quoting Weston v. State, 60 N.J. 36, 51 (1972)). We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding . . . ." In re Phillips, 117 N.J. at 579 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

"[U]nless the appellate tribunal finds that the decision below was 'arbitrary, capricious or unreasonable[,]' or '[un]supported by substantial credible evidence in the record as a whole,' the de novo findings should not be disturbed." Ibid. (third alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 580 (1963)). On the other hand, we owe no deference to the trial court's legal conclusions. Cosme v. Borough of E. Newark Twp.

12

Comm., 304 N.J. Super. 191, 203 (1997) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The Borough argues the trial court exceeded its limited scope of review of the final administrative determination. The record contains substantial evidence supporting the determination by the hearing officer, whose decision was not arbitrary, capricious, or unreasonable. Termination was reasonable considering the officer's egregious conduct violated the high standards governing police officer conduct.

The Borough asserts its decision to terminate Officer Fugnitti comports with the law. It cites the heightened standard of conduct for police officers on and off the job established by our Supreme Court in Asbury Park v. Department of Civil Service, 17 N.J. 419, 429 (1955). The Borough points to In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960) and argues "misconduct . . . may be based 'merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct.'" (citing Asbury Park v. Dep't of Civ. Serv., 17 N.J. at 429). Although Officer Fugnitti conducted the affair while off duty, the initial contact and text messages occurred while he was on duty, thereby implicating his ability to perform his job as a police officer.

The Borough argues the record supports the termination of the officer. It points out the IA report was thorough and complete, and Officer Fugnitti presented no evidence or testimony to refute the Borough's witnesses and proofs. Instead, the trial court substituted its judgment for the Borough's, despite the fact the termination was reasonable under the circumstances.

The Borough claims the issues the trial court had with the hearing officer's findings did not warrant reversing his findings. Officer Fugnitti paid K.L. before, not after, she filed a formal complaint, as found by the trial court. K.L. was not a necessary witness at the disciplinary hearing because Officer Fugnitti admitted all the conduct and K.L.'s statements were memorialized in the IA report. Moreover, Officer Fugnitti's credibility and admissions did not lessen the severity of his conduct. Contrary to the court's findings, the hearing officer considered Detective Diedtrich's testimony. The BCPO recommendation of a suspension did not outweigh the Borough's decision because the Borough employed the officer, not the BCPO.

The Borough asserts progressive discipline was not applicable and the Supreme Court has held this form of discipline is not fixed or immutable. This is because there are, as here, instances of singularly serious infractions that require removal, even where the officer has no disciplinary record.

A-1740-23

## II.

N.J.S.A. 40A:14-147 permits the removal of a police officer from their position for reasons including "misconduct . . . or disobedience of rules and regulations established for the government of the police department and force . . . ." Our Supreme Court has stated that misconduct under the statute "need not be predicated on the violation of any particular department rule or regulation[,]" but may be based merely upon the "implicit standard of good behavior[,] which devolves upon one who stands in the public eye as the upholder of that which is morally and legally correct." In re Phillips, 117 N.J. at 576 (quoting In re Emmons, 63 N.J. Super. at 140). Because "honesty, integrity, and truthfulness[ are] essential traits for a law enforcement officer[,]" the Court has upheld a termination where, for example, an officer made conflicting statements to IA investigators about an off-duty altercation. Ruroede, 214 N.J. at 362.

"[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public . . . ." State v. Gismondi, 353 N.J. Super. 178, 185 (App. Div. 2002). We have long held police officers are subject to heightened standards of conduct. See, e.g., Twp. of Moorestown v. Armstrong, 89 N.J.

Super. 560, 566 (App. Div. 1965) ("[Officers] represent[] law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public . . . ."). As such, "a police officer's misconduct need not have occurred while [they were] on duty. Suspension or even removal may be justified where such misconduct occurred while [they were] off-duty . . . ." In re Emmons, 63 N.J. Super. at 140.

Progressive discipline is a judicially created doctrine stemming from West New York v. Bock, 38 N.J. 500 (1962). There, the Court held a single instance of misconduct may not be cause for termination. Id. at 523. However, "numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty. Such conduct is particularly serious [by] . . . employees whose job is to protect the public safety and where the[y] . . . serve precise shifts to afford continuous protection." Id. at 522. The Court held an employee's past record cannot "be utilized to prove a present charge which is not one of habitual misconduct. However, it may be resorted to for guidance in determining the appropriate penalty for the current specific offense." Id. at 523 (citing Rushin v. Bd. of Child Welfare, 65 N.J. Super. 504, 517 (App. Div. 1961)).

The Court revisited the progressive discipline doctrine in In re Carter and held "progressive discipline [is not] a fixed and immutable rule to be followed without question. Instead, we have recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." 191 N.J. at 484. "Progressive discipline is not a necessary consideration . . . when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." In re Hermann, 192 N.J. 19, 33 (2007). Indeed, "the question for the courts is 'whether such punishment is "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness."'" In re Carter, 191 N.J. at 474 (quoting In re Polk, 90 N.J. 550, 578 (1982)).

Pursuant to these principles, we reverse the trial court's ruling because its justifications for overruling the hearing officer's decision were not based on "a residuum of legal and competent evidence in the record . . . ." Ruroede, 214 N.J. at 359 (quoting Weston, 60 N.J. at 51). We address the trial court's reasoning in turn.

A-1740-23

That the hearing officer did not find relevant the fact the extortion took place after the alleged report of the rape did not undermine his decision. What mattered was that Officer Fugnitti attempted to pay K.L. for her silence and failed to report the alleged extortion because it would embarrass him and his family. This conduct clearly violated Chapter 75-22(A)(6), which required Officer Fugnitti to accord himself with high ethical standards. It also clearly violated Chapter 75-23(A)(4), which prohibits the withholding information from the police department and requires employees to "report any information concerning <u>suspected</u> criminal activity of others." (emphasis added).

As we highlighted in the preceding sentence, the Borough Code requires officers to report "suspected" criminal activity. Therefore, regardless of whether K.L.'s conduct fell within the legal definition of extortion, it was clearly problematic enough that Officer Fugnitti sought to pay K.L. to leave town. K.L.'s extortive conduct qualified as "suspected criminal activity."

The trial court faulted the hearing officer for not recognizing the BCPO investigation "contain[ed] no indication of any attempt to locate [K.L.] . . . ." The court's opinion does not explain how: K.L. was a necessary witness in the disciplinary proceeding; this was fatal to the recommendation for termination; or impacted the integrity of the BCPO investigation. We are at a loss to see how

18

this issue was relevant considering the BCPO interviewed K.L., Officer Fugnitti had notice of her allegations, and he was able to give his side of the story. Neither the officer, nor K.L., were witnesses at the disciplinary hearing. Therefore, the comparison of witness credibility was not an issue.

Likewise, the court pointed out the allegations against the officer were "based in large part on his own admissions." Again, we fail to see the relevance of this finding or how it requires a reversal of the hearing officer's decision. Assuming the trial court meant this showed the officer was credible or contrite, we are unpersuaded because the serious nature of the officer's conduct came to light well after the fact and while the Borough detective was investigating the matter.

Similarly, it was not dispositive that Detective Diedtrich found Officer Fugnitti credible and forthcoming. The officer's honesty only came to light after he had committed serious infractions, which he failed to disclose, and after the Borough and the BCPO investigations were under way. In other words, the fact that the officer cooperated in the investigation does not negate his violations.

The trial court's criticism of the hearing officer for ignoring the BCPO's recommendation of a suspension because it was "the only neutral and ultimate decider in this matter" misunderstood the role of the participants. The hearing

19

officer was the sole factfinder in the disciplinary hearing and the Borough the decider of whether to terminate its employee. The BCPO's role was advisory in that it "may make non-binding recommendation[s] regarding the discipline to be imposed by the appropriate authority." Off. of the Att'y Gen., Internal Affairs Policy & Procedures § 5.1.8 (rev. 2022).

Finally, the trial court misapplied the law to the facts of this case when it concluded progressive discipline was appropriate. As we noted, the court parsed the facts in In re Carter, Miller, and Salimone to distinguish them from Officer Fugnitti's conduct. However, whether progressive discipline was appropriate did not turn on whether the officer was a recidivist like Carter, dishonest like Miller, or under indictment like Salimone. The whole import of our jurisprudence regarding whether to impose progressive discipline, especially in this case, emanates from the gravity of the officer's offenses. In other words, the question was: is progressive discipline the appropriate measure where an officer had engaged in serious infractions? For these reasons, we conclude the trial court's attempts to distinguish the cases missed the mark.

We are also unpersuaded by the factual basis the court found warranted progressive discipline. The fact the BCPO investigation indicated the sexual contact was consensual and there was no per se extortion does not convince us

20

these factors outweighed the Chief's testimony as to the reasons why Officer Fugnitti should be terminated. Again, the employment decisions belonged to the Chief and the Borough.

The Chief and the Borough had ample reasons to seek Officer Fugnitti's termination. He obtained the phone number of a vulnerable woman while on a service call and quickly engaged in sexual text messaging, which led to a sexual encounter. This sexual encounter then led to rape allegations and an alleged extortion. The officer failed to report anything until it was evident his misconduct was revealed. This case had nothing to do with ending an officer's career for having an extramarital affair; his misconduct was unbecoming and egregious, occurred both on and off duty, and clearly violated Borough Code.

Police officers occupy a special role in ensuring public safety, which requires them to operate with the utmost integrity in all spheres. For these reasons, the facts justified termination rather than progressive discipline and the trial court's finding the hearing officer's decision was unreasonable, arbitrary, and capricious was error.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1740-23