**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0671-18T2

IN THE MATTER OF GARY
BODE AND FRED
O'CALLAGHAN, EAST JERSEY
STATE PRISON, DEPARTMENT
OF CORRECTIONS,

_____

Argued September 16, 2020 – Decided October 27, 2020

Before Judges Fuentes, Whipple and Rose.

On appeal from New Jersey Civil Service Commission, Docket Nos. 2018-1671 and 2018-1708.

Kara A. MacKenzie argued the cause for appellants Gary Bode and Fred O'Callaghan (The Law Offices of Gina Mendola Longarzo, LLC, attorneys; Kara A. MacKenzie, on the briefs).

Elizabeth A. Davies, Deputy Attorney General, argued the cause for respondent New Jersey Department of Corrections (Gurbir S. Grewal, Attorney General, attorneys; Donna Arons, Assistant Attorney General, of counsel; Elizabeth A. Davies, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Donna Arons, Assistant Attorney General, of counsel; Beau C.

Wilson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

In this matter, petitioners Lieutenant Gary Bode and Lieutenant Fred O'Callaghan appeal from a September 21, 2018 final disciplinary action by the Civil Service Commission (Commission) imposing a sixty-working-day suspension of petitioners' employment as officers of the Department of Corrections (DOC). We affirm.

Petitioners both worked for the DOC as corrections officers at East Jersey State Prison (EJSP). On August 26, 2017, O'Callaghan was serving as the Area Lieutenant responsible for the area known as the Big Yard, a large, enclosed, outdoor recreation area. Bode was serving as the Operations Relief Lieutenant. And during their shift, there was a physical altercation between two inmates in the yard. The fight occurred during a movement, when a large group of nearly 200 inmates were being moved from the yard to their cells through the sally-port. The sally-port is a holding area enclosed by large gates that connects the yard back into the prison. When the incident occurred, approximately ninety-seven inmates remained in the yard.

Upon witnessing the fight, Officer Kenneth Bennett, who was assigned to the yard, called a Code 33. This emergency code indicates an inmate fight or

disturbance.  O'Callaghan responded to the Code, and Bennett informed him of what had occurred.  Then, O'Callaghan saw that an injured inmate was convulsing on the ground and the inmate believed responsible for fighting the injured man was ordered to approach the gate, where he was handcuffed and escorted from the area.  O'Callaghan observed that the injured inmate had stopped convulsing and was lying motionless on the ground.  Because of this, O'Callaghan called a Code 53, indicating a medical emergency, and ordered Bennett to open the sally-port gate and entered the yard.  At this point, O'Callaghan radioed for a "suited team," meaning a team wearing protective gear consisting of helmets, protective vests and carrying weapons.  O'Callaghan did not wait for the suited team, but instead entered the yard unsuited.  When O'Callaghan entered the yard, several other officers left their posts and followed his lead into the yard without protective gear.

Ninety-seven unsecured inmates remained in the yard. With this turn of events, O'Callaghan and the other officers were significantly outnumbered in the yard.  They ordered inmates to retreat to the area along the fence in the yard, and the inmates complied.  After O'Callaghan entered the yard, Sergeant Anthony Vargas, the Operations Sergeant, responded to the Code 33 at the gates of the yard with his team of thirteen suited officers.  When Vargas and his team entered the yard, they ordered the ninety-seven inmates to lie on the ground, creating a protective barrier

A-0671-18T2

between the inmates, O'Callaghan and the other guards. Vargas ordered the unsuited officers, who had followed O'Callaghan, to leave the yard. Bode also entered the yard without wearing any protective gear and without a suited team.

Once the injured inmate was taken out of the yard, accompanied by O'Callaghan and the prison medical staff, Vargas instructed his suited team to exit the yard. Bode, who was still present and unsuited in the yard, stopped Vargas and instructed him to remain in the yard with his team. Bode proceeded to leave the yard to speak with Sergeant Stephen Linardos over the phone about moving the inmates out of the yard. After Bode left the yard, Vargas directed his team to exit the yard, contrary to Bode's order. O'Callaghan subsequently ordered Vargas to leave the yard with his team. Finally, Vargas and his team then moved the inmates out of the yard without additional confrontation.

Following these events, O'Callaghan and Bode wrote and submitted Unusual Incident Reports. However, neither report mentions that the lieutenants or other officers entered the yard unsuited. Within a few days, a written complaint about the disturbance, alleging that the lieutenants' actions had jeopardized prison security and endangered the staff officers. The matter was referred to the Special Investigations Division Internal Affairs Unit for investigation.

On October 6, 2017, the DOC issued Preliminary Notices of Disciplinary Action (PNDA) to Bode and O'Callaghan, setting forth charges arising from their response to the emergency codes for an inmate altercation and medical emergency in August 2017. Among other violations, the PNDAs charged both petitioners with neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12). In November 2017, the DOC held separate departmental disciplinary hearings as to Bode and O'Callaghan, and in December 2017, the DOC issued Final Notices of Disciplinary Action (FNDA) sustaining all charges listed in the PNDA's and terminating their employment.

The specific charges against both officers in the FDNAs are identical:

> N.J.A.C. 4A:2-2.3 General Causes
> (a) 6. Conduct unbecoming a public employee
> (a) 7. Neglect of Duty
> (a) 12. Other sufficient cause
> Human Resources Bulletin 84-17, as amended,
> B.7. Serious mistake due to carelessness but not resulting in danger to persons or property
> C.11. Conduct unbecoming an employee
> D.7. Violation of administrative procedures and/or regulations involving safety and security
> E.1. Violation of a rule, regulation, policy, procedure, order or administrative decision.

Bode and O'Callaghan appealed their determinations separately to the Commission, which transmitted the appeals to the Office of Administrative Law

(OAL) to be heard as contested cases pursuant to N.J.S.A. 40A:14-202(d). The OAL consolidated the matters and heard them over four days. Petitioners presented the testimony of Senior Corrections Officers (SCO) Edward Parin and Edwin Cordova, both of whom responded to the yard unsuited, and Lieutenant Robert LaPenta, the EJSP training lieutenant who testified concerning the EJSP emergency response procedures. Bode and O'Callaghan also testified.

The DOC presented the testimony of Assistant Superintendent Jeffery John Crothers, an expert on EJSP's policies and procedures, Sergeant. Stephen Linardos, the Star[1] sergeant on the date of the incident, SCO Larry Clouse, a member of Vargas's suited team, and SCO James Colacci, Sergeant. Anthony Vargas, DOC Internal Affairs Investigator Kurt Rocco, and Patrick Nogan, the EJSP Administrator in charge of the incident investigation.

After reviewing the evidence, the Administrative Law Judge (ALJ) issued an initial decision sustaining all charges against both petitioners. The ALJ found that when O'Callaghan entered the yard with several unsuited officers, he "jeopardized the safety and security of the medical staff, the other unsuited officers and O'Callaghan himself . . . creat[ing] a disruption to the orderly

---

[1] The "Star" is a location within the prison where prisoner movements are controlled.

running of the facility." The ALJ also found that Bode's failure to remain in the Star until the emergency was over violated the Internal Management Procedure (IMP) and that by ordering Vargas and his team to stay in the yard, Bode showed poor judgement and recklessness. The ALJ concluded that the DOC had proven that all the charges were supported by the evidence.

The ALJ reversed the terminations, finding the sanction excessive under the circumstances, and modified them to 180-day suspensions. Both petitioners filed exceptions with the Commission, and on September 21, 2018, the Commission, after conducting its review, affirmed the charges against both petitioners, but modified their penalties to sixty-working-day suspensions. This appeal followed.

Petitioners have raised twelve distinct points but essentially argue that the Commission's decision was "arbitrary, capricious and unreasonable" because it was based on the ALJ's factual findings and credibility determinations, which were not supported by substantial credible evidence or were based on incorrect application of DOC's own policies and procedures. Petitioners argue that the plain language of the critical procedures, the IMP and the Post Order, did not preclude all officers from entering the yard unsuited, but merely requires the Initial and Secondary Response teams to be suited. They argue O'Callaghan

indeed responded with a suited team led by Vargas and thirteen SCOs, and that while an inmate fight code mandates a suited team, an emergency medical code does not, and this incident involved both. We reject these arguments.

Our review of agency action is limited. "An appellate court ordinarily will reverse the decision of an administrative agency only when the agency's decision is 'arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record as a whole.'" Ramirez v. N.J. Dep't. of Corr., 382 N.J. Super. 18, 23 (App. Div. 2005) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). "[A]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference." Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). Therefore, "if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citing Clowes v. Terminix Int'l, 109 N.J. 575, 587 (1998); Henry, 81 N.J. at 579-80). Additionally, a presumption of reasonableness attaches to the actions of administrative agencies. City of Newark v. Nat. Res. Council in Dep't of Env'tl Prot., 82 N.J. 530, 539-40 (1980). We defer to

the expertise of agencies where substantial evidence supports the agency's determination. In re Stallworth, 208 N.J. 182, 194 (2011). Accordingly, the findings of the agency should not be reversed because they are based on "sufficient, competent, and credible evidence." N.J.S.A. 52:14B-10(c).

The IMP states that when there is an inmate fight in the yard:

> All unit and area activities will be terminated, all movement will be suspended and all compounds will be secured. . . . These areas cannot be entered until an assessment of the situation can be made. If the involved inmates comply with all staff directives and report to a sally-port for removal then only the necessary officers and supervisors will be dispatched with any necessary equipment. If the situation involves non-compliant inmate(s) and entry may be required then the Initial Response Team ([Thirteen] Officers) will suit up with protective gear and respond to the area. . . . A Secondary Response Team ([Thirteen] Officers) will suit up with protective gear and stand-by for assignment.
>
> Note #1: The first team may only enter the area when the second team is prepared.
>
> (Emphases added).

The IMP clearly states the team should be suited if entry is required. Crothers, the DOC's procedures expert who was found credible by the ALJ, testified that officers are required to be suited when entering the yard during an inmate fight. But O'Callaghan did not wait for a suited team before entering the

yard.  At a minimum, the officers violated the portions of the IMP requiring an assessment to be made and a second team to be prepared before the first team entered.

Moreover, we "defer to [the ALJ's] credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record," State v. Locurto, 157 N.J. 463, 474 (1999) (citing State v. Jamerson, 153 N.J. 318, 341 (1998); Dolson v. Anastasia, 55 N.J. 2, 7 (1969); State v. Johnson, 42 N.J. 146 (1964)), giving "due regard to the opportunity of the one who heard the witnesses to judge their credibility." Logan v. Bd. of Review, 299 N.J. Super. 346, 348 (App. Div. 1997) (citing Jackson v. Concord Co., 54 N.J. 113, 117-18 (1969) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965))).

Here, petitioners dismiss the credibility of Assistant Superintendent Crothers because he began working at EJSP after the incident.  Even so, Crothers had been working in the position of Assistant Superintendent at EJSP for more than six months when the hearing was held.  Accordingly, Crothers was well-suited to review the video surveillance of the incident and the reports generated, even if he was not present at the facility on the day the incidents occurred.

10

Crothers also had experience as a Threat Suppression Team Coordinator, a training lieutenant at New Jersey State Prison and handling internal threats by utilizing intelligence that had been gathered. He also taught at the Correctional Staff Training Academy and instructed lieutenants in emergency response protocol. Bode, for one, had attended Crothers's emergency response class. Ultimately, the ALJ found that Crothers's testimony was credible and based on our review, we discern no reason not to defer to such findings.

Additionally, petitioners argue the ALJ should have given greater weight to the allegation that Vargas's testimony was tainted by a retaliatory motive against Bode. The ALJ found that "Vargas, Clouse, and Crothers testified credibly that it was unsafe to stay in the yard, in part because they were significantly outnumbered by the inmates." In fact, Vargas's testimony was consistent with his prior interviews and was supported by several witnesses. Clouse and Crothers both testified that it was unsafe for Vargas's team to remain in the yard while outnumbered, supporting Vargas's testimony. Further, the ALJ found that Bode did not justify his decision to order Vargas and his team to stay in the yard; O'Callaghan himself revoked Bode's command, the order supporting Vargas's testimony. Even more, Vargas's testimony had independent support in the record and the facts to which Vargas testified, regardless of his motive, are

11

not contested.  See Costantino v. New Jersey Merit Bd. Sys., 313 N.J. Super. 212, 213-15 (App. Div. 1998) (explaining how the trier of fact must assess and weigh the credibility of the witnesses for the purpose of making factual findings on all disputed facts).  Additionally, the record supports the ALJ's conclusion that no evidence supported petitioners' claim that Vargas had a retaliatory motive.

Petitioners also argue Bode did not violate the Operations Lieutenant Post Order; that he did not violate the Emergency Response IMP or jeopardize his own safety; and that his order to Vargas to remain in the yard was not reckless. The Post Order for Bode's position, operations lieutenant, states:

> Whenever an emergency code is called by Center and/or the "Whooper" alarm is activated, the Operations Supervisor on duty will secure the outermost entrance door to the Operations Unit and report to the Star for emergency response assignment until the emergency is cleared by the Center.  Nothing in this document shall preclude an Officer or Supervisor from responding to the aid of another staff member.  Custody Staff members are reminded to assess the risk to themselves and other staff members and act appropriately.  Common sense and good judgment as well as sense of duty shall guide staff in their decision making process . . . .
>
> (Emphasis added).

Therefore, the order provides that the lieutenant should report to the Star, which Bode failed to do. While the Post Order itself does not provide that the responding lieutenant must be suited prior to entering the yard, according to the plain terms of the IMP, "the Initial Response Team ([Thirteen] Officers) will suit up with protective gear and respond to the area." No testimony or other evidence in the record indicates whether the IMP trumps the Post Order, however, they do not conflict.

N.J.A.C. 4A:2-2.3(a)(7) lists "neglect of duty" as grounds for the discipline of a civil servant. Neglect of duty is omission or failure to perform a duty, official misconduct, or negligent acts related to the official responsibilities of a civil servant. Rushin v. Bd. of Child Welfare, 65 N.J. Super. 504, 510-11 (App. Div. 1961). A finding of neglect of duty must be based on the nonperformance of an official duty imposed on a public employee. Id. at 515.

Based on our review of the record, O'Callaghan violated the emergency response IMP; the ALJ's findings regarding that violation are supported by sufficient, credible, evidence; and the Commission's determinations are entitled to deference concerning whether O'Callaghan entered the yard unsuited contrary to the emergency response IMP, which states: "[i]f the situation involves non-compliant inmate(s) and entry may be required then the Initial Response Team

([Thirteen] Officers) will suit up with protective gear and respond to the area." For this reason, the ALJ and Commission's determinations that O'Callaghan neglected his duty should not be disturbed. In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

The ALJ also determined that Bode violated the Post Order because he did not report to the Star and found that Bode violated the emergency response IMP by entering the yard unsuited. Regardless of whether Bode complied with the post order, Bode violated the emergency response IMP when he entered the yard without proper equipment. Accordingly, the record supports the ALJ and Commission's determinations that Bode neglected his duty.

We agree with petitioners that they had a duty to the incapacitated inmate, but we do not agree there was sufficient justification for their violations. The record is devoid of evidence that responding in violation of the IMP preserved human life any more than simply following the IMP in accordance with proper procedure. Indeed, the IMP serves to protect life, and the post order also required petitioners to consider officer safety and assess the situation before acting. Moreover, regardless of the fact that no one was hurt due to the IMP violations, "if not properly operated, prisons have a capacity to become

'tinderboxes.'" Bowden v. Bayside State Prison Dept. of Corr., 268 N.J. Super. 301, 306 (App. Div. 1993).

Petitioners argue that the record does not support the charges of conduct unbecoming a public employee. "An employee may be subject to discipline for . . . [c]onduct unbecoming a public employee." N.J.A.C. 4A:2-2.3(a)(6). Conduct unbecoming refers to "any conduct which adversely affects the morale or efficiency of the bureau . . . [or] which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services." Karins v. City of Atlantic City, 152 N.J. 532, 554 (1998) (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960) (quoting In re Zeber, 156 A.2d 821, 825 (1959))). The conduct in question can be sufficient if it is "'such as to offend publicly accepted standards of decency.'" Id. at 555 (quoting In re Zeber, 156 A.2d at 825).

Discussing conduct unbecoming an officer, we have said, "[A] finding of misconduct . . . may be based merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." In re Emmons, 63 N.J. Super. at 140 (citing Asbury Park v. Dep't of Civ. Serv., 17 N.J. 419, 429 (1955)). We defined conduct unbecoming an officer as "'any conduct which adversely affects the morale

or efficiency of the bureau . . . (or) which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services.'" Ibid. (quoting In re Zeber, 156 A.2d at 825). The record here supports the ALJ's determination that petitioners' violations of the IMP constituted conduct unbecoming.

Petitioners further argue that no one was placed at risk during the incident because the inmates were compliant, hence safety was not a concern. We disagree.

Adherence to order and procedure in prisons is critical, and violating protocol has the potential to subvert order, which can easily escalate in such a highly charged environment. Bowden, 268 N.J. Super. at 306; see Henry, 81 N.J. at 579 ("Maintaining discipline within law enforcement agencies is important for the safety and security of the public.").

Finally, we address petitioners' arguments that the seriousness of the incident does not warrant a 60-day suspension, that progressive discipline does not warrant a 60-day suspension, and that the Commission failed to consider its own precedent when devising the penalty. Our Supreme Court has held that discipline based in part on the consideration of past misconduct can be a factor in the determination of the appropriate penalty for present misconduct. Town

of West New York v. Bock, 38 N.J. 500, 523 (1962) (citing Rushin, 65 N.J. Super at 517). Therefore, an employee's past record can be a relevant consideration when determining whether the penalty imposed is appropriate. Ibid.

Thus, "[i]n matters involving discipline of police and corrections officers, public safety concerns may also bear upon the propriety of the dismissal sanction." In re Carter, 191 N.J. at 485; Henry, 81 N.J. at 579. Deference is accorded to an agency's determination of the appropriate penalty, and a reviewing court should only modify that penalty if it concludes that the decision to impose such penalty was arbitrary, capricious, or unreasonable. Henry, 81 N.J. at 579-80. Here, after considering petitioners' disciplinary records, the Commission reduced the ALJ's penalty from a 180-day suspension to a sixty-working-days suspension. We reject the argument that this was arbitrary, capricious, and unreasonable.

We conclude that sufficient, competent, and credible evidence in the record supports the Commission's final disciplinary actions. Under our standard of review, we see no basis to interfere with that determination. Any additional arguments raised in petitioners' submissions that have not been specifically

addressed were found to lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0671-18T2