65 N.J. Super. 504 (1961)
168 A.2d 238
B. ELIZABETH RUSHIN, PLAINTIFF-APPELLANT,
v.
BOARD OF CHILD WELFARE, DEPARTMENT OF INSTITUTIONS AND AGENCIES, AND CIVIL SERVICE COMMISSION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1961.
Decided February 20, 1961.
*507 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Robert Burk Johnson argued the cause for appellant.
Mr. Lee A. Holley, Deputy Attorney General, argued the cause for respondents (Mr. David D. Furman, Attorney General, attorney; Mr. William L. Boyan, Deputy Attorney General, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
This is an appeal from a final order of the Civil Service Commission, upholding the action of the State Board of Child Welfare in removing petitioner from her employment as a permanent social case worker and temporary child welfare analyst. The discharge stemmed from the alleged violation of agency regulations prohibiting the placement of Board-supervised children in the homes of staff members or their relatives and requiring that permanent records be kept of all official interviews.
Petitioner was first employed by the Board in 1947 and assigned to its Camden office. She served as a social case worker until September 1958, when she was appointed  temporarily, pending examination  to the position of child welfare analyst. The factual prelude to petitioner's dismissal commenced in late October 1958, when she had occasion to interview, at the Camden office, Mrs. M. The latter had given birth the previous June to a baby boy and was in search of information with respect to adoption procedures. The circumstances of the child's birth are beclouded in the record, but it is clear that Mrs. M.'s husband was not the father of the child. Mrs. M. and her husband were members of the Caucasian race; the child was beginning to develop Negroid features. At the insistence of her husband that the child be removed from the M. household  which included two legitimate children  she had, with great reluctance, visited the Board offices for guidance. Petitioner, a Negress herself, recognized the unusual strain and conflict *508 besetting Mrs. M., who deeply desired to retain the child. It was therefore suggested to Mrs. M. that she return to the Board office with her husband for a further conference.
The meeting took place on October 31, 1958. Petitioner explained to Mr. and Mrs. M. the Board's voluntary care program, its foster home plan, and various other of its services. Mr. M. was particularly interested in the foster home program, but, upon learning that under such a plan he would have to contribute to the child's maintenance, he declined to make application for placement. At this juncture, according to petitioner, she was asked by Mr. M. whether she would consider taking the child herself; she responded, "I would like to have a child like that, but I am an employee of this Agency and I would not be permitted to take the child. Anybody would like to have a child like him. He is such a handsome little fellow." Mr. M. persisted, asking, "What about your relatives?" Petitioner told him that she "knew they would be glad to take the child. They love children and they have children of their own." On the witness stand petitioner explained that these comments had been made because "I didn't want him to feel that I, too, was rejecting the child. I know he was, and I knew he had a good reason to."
Additional discussion ensued over whether Negroid characteristics were apparent in the child; petitioner claims that at this point she brought the child into her supervisor's office for an opinion on this question and for advice on how to proceed in the entire matter. The supervisor, under oath, could not recall such an incident, and professed ignorance of the entire affair until several months thereafter. In any event, petitioner assured Mr. and Mrs. M. that the child did indeed appear to be Negro. Mrs. M. thereupon repeated her unwillingness to surrender the baby, and the couple left the Board office without having signed any application forms or having come to any conclusion regarding the infant. Petitioner testified that after Mr. and Mrs. M. had left, she was asked what had transpired by the assistant *509 supervisor, Miss Thompson, and she replied, "They didn't give their child up, but I think the woman will break under the strain." Miss Thompson then allegedly suggested to petitioner that she make her own private arrangements for placement of the child. Called as a witness by respondents, Miss Thompson vigorously denied ever having suggested private arrangements to any employee under her supervision.
About two or three weeks after this meeting petitioner received a telephone call at her office from Mrs. M. The latter, extremely upset, stated that her husband had demanded that the child be removed from the house and that she was fearful for the safety of the infant. She pleaded for help, insisting that petitioner was the only one who seemed to understand her problem. But she steadfastly refused petitioner's suggestion that she put the child up for adoption. According to petitioner, Mrs. M. asked her if "somebody would take care of the child until she decided what to do." Petitioner's response to this plea, corroborated by Mrs. M., is best described by her own testimony:
"I contacted a couple of people and asked them if they would be interested in keeping a child for a woman who was sick. They weren't interested. * * * I tried to get one of my relatives to take care of the child for her. * * * I told her she had the responsibility for her other children, that I knew how her husband felt. * * * I knew how she felt, that she should talk to someone and get some professional help so that she could come to some decision about this child.
My sister said that she would take care of the child until Mrs. M. decided what she wanted to do."
As a consequence of the foregoing entreaty and petitioner's sympathetic response thereto, petitioner and her sister arrived at the M. home late one evening in November 1958 and received the baby and some of its clothing from Mr. and Mrs. M. The child was taken to the sister's home in Lawnside, about six miles outside of Camden, where he remained for over three months. During that time, the infant was supported solely by donations from the various *510 members of petitioner's family. Petitioner testified that she neither received nor contemplated receiving any benefits from the taking of custody of the child. She was herself pregnant at the time of this incident and had no personal interest in retaining the infant; the sister with whom she left the baby had three youngsters of her own.
In early February 1959 Mr. M. contacted the Board office for the purpose of inquiring of petitioner whether the baby was a deductible item on his income tax return. As Mrs. Rushin was out, he was connected with the assistant supervisor and, allegedly for the first time, petitioner's actions came to the attention of her superiors. An investigation was immediately undertaken, resulting in her suspension on February 9, 1959 and the preference of charges shortly thereafter.
About two weeks after the suspension petitioner attempted to return the baby to Mr. and Mrs. M., encountered resistance from Mr. M., but finally succeeded in effecting the transfer, with the help of a timely intervention by a local pastor. On February 25, 1959 Mr. and Mrs. M. signed papers which officially placed the child in the care of the Board.
Petitioner was charged with violation of Civil Service Rules 59(a)  "Neglect of Duty"  and 59(e), comprising:
"Violation of any lawful and reasonable official regulation or order made and given by his superior officer or failure to obey any lawful or reasonable direction when such violation or failure to obey amounts to insubordination or serious breach of discipline."
At the departmental hearing petitioner was found to have violated both of these rules, and she was removed from her position, effective February 11, 1959. Upon filing her appeal to the Civil Service Commission, she requested and was furnished a specification of charges, consisting of: (1) failure to make permanent agency records of her interviews with Mr. and Mrs. M.; and (2) undertaking, without authority from her superiors, to place the infant in the hands of persons unknown to the agency. After a *511 full hearing, the Commission upheld the action of the appointing authority, sustaining petitioner's guilt on both of these grounds.
Amplification of the second charge emerged at the Commission proceeding, when the Board introduced Part IV, p. 24, (k), of the agency's Policy Manual, issued June 15, 1953, and providing that:
"It is against policy for any child supervised by SBCW [State Board of Child Welfare] in any program to be placed with SBCW employees or their immediate family. If an unusual situation suggests the value of making an exception to this policy, the district should send a written summary to the Executive Director, presenting the problems involved and the reasons supporting such a placement. After reviewing the summary, the Executive Director will write the district giving his decision approving or disapproving the placement. No placement of this sort is to be made without the written approval of the Executive Director being on file in the district office."
Petitioner contests the Commission's finding that she violated this policy rule. She asserts that the regulation is not applicable to the instant situation as the infant was not, at the time of her alleged improprieties, "supervised by SBCW * * * in any program." She further maintains that a child may come under the protection of the Board only with the consent of its parents, and directs attention to the unrebutted testimony showing that Mr. and Mrs. M., during the period of the alleged infraction, had resolutely declined to surrender the child to the Board and had not even signed any application forms.
The State Board of Child Welfare, created by statute and administered through the Division of Welfare, N.J.S.A. 30:4B-2, is both an added stitch in the pattern of New Jersey child welfare legislation and a primary coordinator of all public and private facilities for the protection and care of children. N.J.S.A. 30:4C-4. Its functions are delineated in accordance with the policy principles embodied in N.J.S.A. 30:4C-1, encouraging the preservation and strengthening of family life and the prevention and correction of dependency and delinquency. See State *512 Bd. of Child Welfare v. P.G.F., 57 N.J. Super. 370, 375 (Juv. & Dom. Rel. Ct. 1959). They consist essentially of the furnishing of care, custody, and welfare services to eligible children. N.J.S.A. 30:4C-3. Provision is also made for the assumption of complete guardianship by the Board, upon the satisfaction of one of certain listed conditions, by means of a petition and subsequent proceedings in the Juvenile and Domestic Relations Court of the county where the child may be found. N.J.S.A. 30:4C-15 to 24.
Aside from the guardianship proceedings  whose successful prosecution is tied to the moral or economic delinquency of the child's lawful custodian, the child's own delinquency, or a showing that the best interests of the child require that he be placed in agency custody, N.J.S.A. 30:4C-15  jurisdiction of the Board is dependent on the consent and approval of the child's adult or administrative protector. N.J.S.A. 30:4C-5; 30:4C-23. Such consent is first manifested in the form of a written application for welfare services by the person or agency interested in and cognizant of danger to the child's welfare. N.J.S.A. 30:4C-11. Upon receipt of such an application, the Board proceeds to verify the statements made therein and to investigate the circumstances of the child. If, and only if, it is ascertained that the welfare of the child is endangered, that there is no other available and willing welfare agency, that adequate financial assistance is not available under our laws, that the legally responsible provider cannot be located or otherwise induced to contribute the necessary support, and that immediate physical or mental care is not required, may the Board then "accept and provide such care or custody as the circumstances of such child may require." N.J.S.A. 30:4C-12.
The policy regulation which petitioner was found to have violated must be read in the context of the statutory scheme outlined above. The Legislature clearly provided for preliminary proceedings preparatory to the decision of the Board whether or not to exercise its supervisory and custodial powers. The act is sprinkled with references to the *513 crucial cut-off point: the decision, after application, verification and investigation, whether or not to "accept" the child. See, in addition to ibid., N.J.S.A. 30:4C-13, requiring that the Board, before accepting any child, exhaust all other official and legally responsible private agencies of aid, and N.J.S.A. 30:4C-27, permitting maintenance costs for a supervised child to be chargeable against allotted state funds, but only such costs as are incurred after the date of "acceptance" of care or custody of the child as provided in section 12, supra.
The foregoing analysis is bolstered by the agency's own statements of policy. Its functions are characterized as basically two-fold: the furnishing of on-the-spot advice to inquirers, and the actual taking of control or supervision of the child. The former program, sloganed as "Non Application Service (NAS)," is defined in the Policy Manual, Part III, p. 1, issued January 1, 1953, as follows:
"This is primarily an advice-and-referral service for children's problems. It consists of one-day or other brief service cases in which we terminate our service by referring the inquirer to other agencies; by giving advice or consulation [consultation] only; by our inability to provide a service or advice, or to have it accepted by the inquirer (non adjustment); by the inquirer's withdrawal; or by some solution reached without using any other SBCW program."
The second program encompasses two degrees of control. "Care" is considered voluntarily transferred "supervision over the child's person"; "custody" is similarly defined, but with the added feature of surrender of legal custody to the Board.
It is abundantly evident that the regulation under review has reference only to that stage of Board control which follows "acceptance" of a child into one of its programs. Petitioner's official dealings with Mr. and Mrs. M.  as irrebuttably gathered from the proofs  never progressed beyond the "advice" phase, and were in effect terminated by the persistent refusal of the couple to enroll in a Board program. The M. child was therefore not "supervised by *514 SBCW in any program" within the language of the policy rule.
Respondents urge that we look behind the literal terms of the ruling to determine whether its purposes have been offended by petitioner's conduct. They maintain that the objective of the rule, to prevent the improper disposition of infants, is jeopardized by actions such as plaintiff's, which are "more likely to remain hidden than conduct coming within the literal terms of the regulation."
We have little hesitation in agreeing that petitioner's conduct should not be condoned. Her actions with regard to the M. infant  while perhaps altruistic in design  would, if permitted as a matter of course, lead to a deterioration of the morale and efficiency of the department and the undermining of public confidence in the agency and the vital endeavors in which it is engaged.
On the other hand, we cannot concur in the view that this specific policy rule should be given so broad a sweep as to gather within it all analogous infractions inimical to the public welfare. Disciplinary proceedings against a civil servant are not only an attempt to determine the status of a particular individual; they are a statutorily authorized action to redress a wrong committed against the people of the State by one in whom the public trust has been officially reposed. See Borough of Park Ridge v. Salimone, 21 N.J. 28, 44 (1956). The proceedings are therefore penal, or at least quasi-penal, in nature, and deeply embedded constructional principles, supported by fundamental notions of fairness, dictate that in such an action the statute or regulation defining the alleged violation be construed to comport with the fair meaning of the language used. See 82 C.J.S. Statutes § 389, pp. 922-931. The theme of fairness threads its way through the notice, hearing, and right of appeal provisions of our Civil Service Act, N.J.S.A. 11:1-1 et seq., and finds particular pertinence in those sections requiring that the causes for removal constituting "just cause" be enumerated with specificity. See R.S. 11:15-2, 11:15-3. *515 The governing consideration, that one be fairly and completely advised of the nature of the charges against him, loses all effectiveness if it is not reinforced by a requirement that the proscribed activities and contingencies warranting disciplinary proceedings be set forth with reasonable particularity and construed accordingly.
We are therefore not inclined to uphold petitioner's discharge on the ground of prohibited placement in a relative's home. The primary goal of the policy ruling is to prevent the placement of children, who are under the direct control of the Board through their parents' voluntary release of custody or consent to adoption, in the homes of staff employees or their immediate families. "Placement" is given a specialized meaning by both the enabling statute, N.J.S.A. 30:4C-26, and the agency regulations; it pertains to the official location of a child in a family home or institution, with the attendant right to maintenance and medical costs through state and county funds. In the instant case, not only  as we have stated  was Mrs. M.'s child never brought under the protective custody of the Board, but the lack of any formal release of custody or consent to adoption and the circumstances under which the child was cared for make it plain that the M. baby was not "placed" with the petitioner's sister but was merely supported temporarily in an act of seeming charity.
The State has not argued on this appeal that if petitioner's conduct in regard to placing the child is not a violation of the specific policy rule mentioned it should, nevertheless, be considered as constituting "Neglect of Duty," within Rule 59(a). Nor would we so regard it. She did not neglect any duty imposed upon her. She simply did something imprudent, which could appropriately be the subject of a prohibitory regulation, but had not yet been made so by the agency at the time of this incident.
Petitioner next contests the Commission's determination that she violated departmental regulations in failing to record her office contacts with Mr. and Mrs. M. on permanent *516 agency records. The crux of her assertion in this respect is that the existence of specific regulations, allegedly violated by her, were never proved before the Board. While references to such a policy rule were rather oblique at the hearing before the Commission, the precise regulations on which respondents rely were presented to us at oral argument, and were at that time stipulated by the parties to be part of the record. These regulations reveal unmistakably that petitioner was required to maintain a daily record, called a "Day Sheet," of all "case-work content." The latter term is defined to include petitioner's conferences with Mr. and Mrs. M., to wit:
"Receiving information by listening and/or observing a person or persons, and reviewing written material, in regard to a particular child's situation and problem; and evaluating the information received to determine the nature of the problem and what, if anything, can be done to solve it, by the SBCW and by other persons."
It is conceded that petitioner did not record her contacts with Mr. and Mrs. M. on her Day Sheet. She claims, however, that this was due merely to pressures of time and that she did take notes of the M. interviews in her personal notebook which, in conformance with agency rules, she turned in to her supervisor upon termination of her employment. Her contention is that she was only charged with failure to keep "permanent agency records" of her interview and that production of the notebook absolves her of that asserted violation.
We are convinced, however, that the Day Sheet is the "permanent record" referred to in the specification. The testimony of Miss Kelley, respondent Board's assistant supervisor, is especially persuasive in this regard. She testified that while the notebooks are mainly "for the convenience of the worker for purposes of dictation and so forth," the Day Sheet is a form "whereby every contact the worker makes or an analyst makes is recorded"; further, that the Day Sheets are filed on a weekly basis with the supervisor, *517 who checks them, and are then filed away as permanent records.
Whatever petitioner's motives in failing to fill out her Day Sheets, she has in effect confessed to an omission which is in clear violation of a specific agency regulation. The Day Sheet may not have been designed primarily for preventative purposes, but it undoubtedly functions as a check by the supervisors on the activities of the analysts and case workers, with a view to forestalling secret and unauthorized arrangements.
Our conclusion that petitioner's omission to record her interviews on the Day Sheets constituted "violation of a lawful and reasonable official regulation," Civil Service Rule 59 (e), renders superfluous consideration of whether the omission would otherwise have amounted to "Neglect of Duty" under Civil Service Rule 59 (a).
While we are empowered to make original findings in our review of the Commission's determinations, R.R. 4:88-13; 1:5-4(b); cf. City of Asbury Park v. Dept. of Civil Service, 17 N.J. 419, 423 (1955); East Paterson v. Civil Service Dept. of New Jersey, 47 N.J. Super. 55, 65 (App. Div. 1957), our regard for that body's broad statutory authority to modify or amend the original imposition of punishment (R.S. 11:15-5, 11:15-6) convinces us that this cause should be remanded for redetermination of a proper penalty. This is the generally accepted disposition in civil service disciplinary proceedings where some, but not all, of the original charges are sustained on appeal. Kaplan, The Law of Civil Service, p. 276 (1958). At the rehearing, evidence pertaining to the motives of petitioner in failing to make the daily entry, as well as proof of her past record of service, may be offered by both parties as a guide to the Commission in the exercise of its judgment. See Dutcher v. Department of Civil Service, 7 N.J. Super. 156, 162 (App. Div. 1950). That judgment, once entered, will be subject to reversal only if it is found to be arbitrary, capricious, or unreasonable, and the burden will be upon petitioner *518 to demonstrate that the penalty imposed is not a reasonable and valid exercise of the Commission's authority. State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1935); City of Asbury Park v. Dept. of Civil Service, supra; Greco v. Smith, 40 N.J. Super. 182, 184-85 (App. Div. 1956); Briggs v. N.J. Dept. of Civil Service, 64 N.J. Super. 351, 354 (App. Div. 1960).
Reversed and remanded to Civil Service Commission for redetermination of penalty.