**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1585-22

IN THE MATTER OF
SIMONNE ALI,
PLAINFIELD DEPARTMENT
OF PUBLIC AFFAIRS AND
PUBLIC SAFETY.

_____

Argued May 7, 2024 – Decided August 15, 2024

Before Judges Sumners and Rose.

On appeal from the New Jersey Civil Service Commission, Docket No. 2018-1193.

Michael S. Simitz argued the cause for appellant Plainfield Department of Public Affairs and Public Safety (Kologi Simitz, attorneys; Edward J. Kologi and Michael S. Simitz, of counsel and on the briefs).

Ira W. Mintz argued the cause for respondent Simonne Ali (Weissman & Mintz LLC, attorneys; Ira W. Mintz, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Paulina R. DeAraujo, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

The Plainfield Department of Public Affairs and Public Safety (Department) appeals from a January 23, 2023 final decision of the Civil Service Commission adopting the Administrative Law Judge's (ALJ) initial decision reversing the Department's termination of Simonne Ali's employment and awarding her back pay, seniority, and counsel fees. We affirm because we conclude there was credible evidence in the record to support the Commission's decision.

I.

A.

On April 14, 2017, Douglas Matthews, a detainee in the Department's jail, was found dead in his cell. Ali, a civilian police aide whose job it was to conduct periodic checks on Matthews, was placed on administrative leave while the Department and the Union County Prosecutor's Office (UCPO) separately investigated the incident.

On August 17, the Department served Ali with a preliminary notice of disciplinary action alleging she "failed to do face[-]to-face checks and did not properly perform her duties during the course of an in-custody death in the cell block." Ali was charged with: violating Articles 3.1.1 (Performance of Duty), 3.1.3 (Obedience to Laws, Ordinances, Rules and General Orders), and 3.7.14

(Prohibited Activity On-Duty) of the Police Division's Rules and Regulations; incompetency, inefficiency, or failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and other sufficient cause, failing to follow police directives, N.J.A.C. 4A:2-2.3(a)(12). Ali did not seek a departmental hearing; the Department sustained the charges and on September 28, served her with a final notice of disciplinary action terminating her employment.

B.

Ali appealed her termination to the Commission, which transferred the matter to the Office of Administrative Law (OAL) as a contested case. During nine hearing days, spread out over three years due to the ALJ's illness and the pandemic, the following relevant evidence was presented.

Ali, hired in 2014, was responsible for conducting physical checks every thirty minutes on detainees held in Plainfield police headquarters' jail. Each inspection was to be contemporaneously documented by punching into a time stamp machine in the cell block area. This duty mirrored N.J.A.C. 10A:34-4.1(b)'s requirement that: "Physical cell checks of detainees shall be conducted at least every 30 minutes."

Ali also booked, fingerprinted, photographed, and documented detainees, secured their personal property, conducted criminal history and identification checks, and investigated whether a stopped motorist had any outstanding arrest warrants. An undated memorandum by Plainfield Police Lieutenant Jeffrey T. Plum (Plum memo), one of Ali's supervisors, advised police aides who missed face-to-face checks due to "immediate/emergent work that was being done during the time that the [time] stamp was mandatory" were to leave written comments in their jail logs describing the emergent task that "prevented the inspection[s] from being conducted."

In March 2015, Ali attended a cell block management training session with now-retired Union County Department of Corrections (UCDOC) Captain Anthony Bonito. The captain told attendees "[s]taff assigned to supervise detainees" should perform "[p]hysical cell checks of detainees . . . at least every [thirty] minutes" and record the "[d]ate and actual time of each physical cell check." He also advised "[l]og [b]ook [e]ntries . . . [s]hould not follow a specific time pattern" and detainees "should not" know when the next "check will be conducted."

On the evening of April 13, 2017, Ali started her duties at 11:15 p.m. and was scheduled to get off on April 14 at 12:15 p.m. She was the only police aide

on duty at the time. She processed seven detainees, including Matthews, who was charged with possession of a controlled dangerous substance (heroin). Matthews was placed in a cell at 6:26 a.m. on April 14. After processing Matthews, Ali resumed completing paperwork for the detainees she had processed earlier in her shift. She gave Matthews breakfast at 7:07 a.m. and a bottle of water two minutes later.

Security camera footage of Matthews' cell showed Ali did not return to his cell. Around 12:33 p.m., Ali was found unresponsive in his cell by Debra Barlow, the police aide whose shift followed Ali's. Matthews was last seen in video footage of his cell moving at approximately 9:35 a.m. It was determined that Matthews died from the combined effects of ingesting cocaine and fentanyl.

Before the OAL hearing, Ali stipulated to the times she stamped her jail log on the day Matthews died. Her log showed punches at: 1:33 a.m., 2:03 a.m., 5:34 a.m., 6:31 a.m., 7:03 a.m., 7:36 a.m., 8:07 a.m., 8:38 a.m., 9:02 a.m., and 11:38 a.m. Between the 2:03 a.m. and 5:34 a.m., Ali wrote "[b]ooking" three times and "[p]rinting" three times. Between her 5:34 a.m. and 6:31 a.m. time stamps, she wrote "[b]ooking." Between her 9:02 a.m. and 11:38 a.m. time stamps, she wrote "[v]isual . . . [c]heck [of live security camera footage of the cell block]," "[b]ooking," and "[p]rinting."

A-1585-22

Plainfield Police Detective William Tyler, who investigated Matthews' death for the Department, testified that departmental policy[1] required face-to-face checks on detainees every thirty minutes. He stated police aides were responsible for "those half[-]hour checks" even if they were "alone in the booking area" completing other work, as the face-to-face checks took "priority over everything" else, including responding to immediate requests from police officers seeking to find out whether a stopped motorist had any outstanding arrest warrants and booking, fingerprinting, photographing, and documenting newly arrived prisoners. He also confirmed departmental policy required police aides to record the "actual times" they conducted face-to-face prisoner checks in their detention logs. He acknowledged this view contradicted the Plum memo which he maintained was "not authorized" and "not official."

UCDOC Captain Bonito testified "[a thirty-]minute check requires a [thirty-]minute check . . . absent anything else as indicated by the [s]tate statute and standards." He stated police staff should vary their face-to-face check times so detainees could not guess when they would occur. He also acknowledged

---

[1] Plainfield Police Division General Order Volume 5, Chapter 7, Roman Numeral 8, Section C, which was modelled after N.J.A.C. 10A:34-4.1(b).

that certain "life[-]threatening" emergencies might justify skipping a required face-to-face check.

Plainfield Police Sergeant Wayne Slaughter, who trained Barlow and another police aide, testified he taught them that the thirty-minute face-to-face checks were mandatory. He instructed them to "document the reason why [they] couldn't do it on the jail log" whenever "they couldn't do their physical check within [thirty] minutes." He testified police aides could not time stamp their jail logs without performing face-to-face checks.

Barlow's testimony differed from Slaughter's recollection. She testified Slaughter trained her to ask a police officer to time stamp her jail log if she had to skip a face-to-face check to complete other tasks, after which she could initial the time stamp on the jail log herself. Barlow, however, admitted she skipped face-to-face checks when she was busy with other tasks without asking police officers to time stamp her jail log. She testified she listed the work she was performing when she skipped a check but would not initial the entry when she did so. Barlow also stated she knew other police aides skipped face-to-face checks when performing other work like she and Ali had done.

Lastly, Plainfield Police Lieutenant Christopher Sylvester, who frequently supervised Ali as the watch commander during her shifts, did not recall ever

7

questioning police aides who noted tasks they were performing when they skipped a face-to-face check instead of time stamping their jail logs to show they had performed the checks as scheduled.

## C.

The ALJ issued an eighty-nine-page initial decision reversing Ali's termination. The ALJ found the Department's own directions led police aides to believe they were "allowed . . . to skip the half-hourly face-to-face checks if they were busy with other duties as long as they wrote the reasons for doing so in the[ir] jail logs." He held it was not Ali's fault these instructions contradicted the plain language of N.J.A.C. 10A:34-4.1(b), and it was reasonable "to follow the directives of [police aides'] trainers and . . . the Plum [m]emo under these circumstances." The ALJ found Slaughter's testimony established that police aides were taught "modified, more elastic" practices consistent with the Plum memo, which sought "to address practical, real-life circumstances faced by" police aides "unable, but not unwilling, to" perform face-to-face checks every thirty minutes. The ALJ found the Plum memo was "a valid order" permitting "police aides to skip face-to-face checks under . . . limited circumstances." The ALJ also determined there was insufficient evidence to support the Department's contention that Ali was watching movies and preoccupied on her cell phone

8

instead of doing face-to face checks "because [she] was on the move every few minutes, making it impossible to watch a movie."

Determining Ali's conduct prior to Matthews' death was consistent with her training, the ALJ recommended reinstating her employment. He reasoned "it would be fundamentally unfair to" discipline Ali because the Department, "as the one in control of the workplace," failed to "give fair warning or fair notice of prohibited conduct" and the "standards of expected performance." He cited Rushin v. Bd. of Child Welfare, 65 N.J. Super. 504, 514-15 (App. Div. 1961), where this court concluded public bodies must set forth its standards for employees' conduct "with reasonable particularity."

The Commission "accepted and adopted the Findings of Fact and Conclusion as contained in the ALJ's initial decision and his recommendation to reverse the removal." Ali was awarded "mitigated back pay, benefits and seniority . . . from the first date of separation until the date of reinstatement," as well as reasonable counsel fees.

II.

A.

Before us, the Department contends the Commission's decision was arbitrary and capricious. First, the Department asserts the agency ignored the

allegation that Ali's jail logs contained false information, which violated state policy prohibiting false reports from prison security officials, In re Warren, 117 N.J. 295, 299 (1999), and undermined the public's interest in prisoner health and safety, see N.J.S.A. 30:1B-3. The Department maintains Ali stipulated to falsely stamping her jail log multiple times, claiming those time stamps are "substantial credible evidence" warranting her discipline.

Second, the Department claims the Commission ignored Ali's failure to conduct the required face-to-face checks. While conceding the Plum memo was binding, the Department argues the record fails to show Ali was performing immediate or emergent work permitting her not to conduct face-to-face checks. The Department claims the record does not show what Ali was doing when she was required to conduct the checks, nor does it show why Ali could "walk to the timestamp machine" but "could not perform the face-to-face checks on the cells located on the way to that machine, a task which [she] could have . . . easily completed."

B.

The scope of our review of quasi-judicial agency determinations is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J.

14, 27 (2011)).  That is particularly true "[i]n light of the executive function of administrative agencies."  Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995).  Accordingly, "[a]n agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'"  Saccone v. Bd. of Trs. of Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo, 206 N.J. at 27).  The party challenging the administrative action bears the burden of making that showing.  Lavezzi v. State, 219 N.J. 163, 171 (2014). Furthermore, we may not substitute our judgment for that of the agency's when "substantial credible evidence supports [the] agency's conclusion."  Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992).  We do not "engage in an independent assessment of the evidence as if [we] were the court of first instance."  In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquires:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars, 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007).

## C.

Considering the principles guiding our review, we conclude the Department has not shown that the Commission's decision to reverse the Department's termination of Ali and reinstate her employment with back pay, benefits, seniority, and reasonable counsel fees was arbitrary, capricious, or unreasonable, or unsupported by credible evidence in the record. We find no merit to the Department's contention that the Commission should have disciplined Ali for making the stipulated false jail log entries. There is no evidence that Ali admitted that the entries reflected that physical checks were done. The accuracy of her jail log entries was "part of" the Department's

overarching contention that she did not properly perform her duties, a position the ALJ thoroughly rejected when he found she acted in accordance with her training. The Commission recognized Ali stipulated that she time stamped the jail log at certain times, and she did not perform face-to-face physical checks on Matthews. But, as the Commission correctly explained, there was no evidence that Ali admitted her time stamps indicated face-to-face checks were done. The record demonstrated that time stamping did not signify a police aide performed a face-to-face check on a jail detainee. Given our discretionary standard of review, we discern no reason to disturb the Commission's final decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13

A-1585-22