**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2062-23

RICHARD PIZZUTI,

    Plaintiff-Respondent,

v.

TOWNSHIP OF LYNDHURST,
MAYOR ROBERT B.
GIANGERUSO, CHIEF OF POLICE
RICHARD L. JARVIS, and
CAPTAIN OF POLICE JOHN
MAZURE,

    Defendants-Appellants.

_____

Submitted January 16, 2025 – Decided June 9, 2025

Before Judges Mawla and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1486-22.

Eric M. Bernstein & Associates, LLC, attorneys for appellants (Eric M. Bernstein, of counsel and on the briefs; Brian M. Hak, on the briefs).

Alterman & Associates, LLC, attorneys for respondent (Stuart J. Alterman, on the brief).

PER CURIAM

Defendants the Township of Lyndhurst (Township), Mayor Robert B. Giangeruso, Chief of Police Richard L. Jarvis, and Captain of Police John Mazure appeal from a February 2, 2024 order vacating a finding by a hearing officer recommending the termination of plaintiff Sergeant Richard Pizzuti from the Lyndhurst Police Department (LPD), and instead imposing a twenty-one-day suspension without pay for the charge of conduct unbecoming a police officer. Based upon our review of the record and the applicable legal principles, we affirm.

I.

Sergeant Pizzuti began his career in law enforcement in 1999, serving the LPD for approximately twenty-one years before the relevant incident. Initially a patrolman, Sergeant Pizzuti's superiors later assigned him to the Drug Enforcement Agency (DEA) as a task force officer. After serving seven years in that role, he "was assigned to the [d]etective [b]ureau as a sergeant," and subsequently assigned to the patrol division with the same rank.

Aside from the incident at issue, Sergeant Pizzuti had been disciplined once in his career when he lost three leave days "for not reporting [an] assault

2

by his ex-girlfriend[,] which occurred off[-]duty. The police department learned of the incident because the girlfriend who assaulted him went to police headquarters and reported it. [Sergeant Pizzuti] testified he was embarrassed by the incident and signed off on the punishment to move forward."

The facts underlying Sergeant Pizzuti's disciplinary proceedings stem from an incident, which occurred on January 17, 2020, when Officer Edward Montoya arrested an individual for possession of narcotics and drug paraphernalia. Upon searching the suspect, Officer Montoya discovered in his possession a digital scale that a local high school had previously reported missing. While Officer Montoya placed the narcotics and drug paraphernalia in an evidence locker, the scale was photographed and separated from the other evidence so it could be returned to the high school.

At approximately 7:00 p.m., Officer Montoya finished processing the suspect and released him. However, he had not yet finished drafting the arrest report. Around that time, Sergeant Pizzuti and Acting Sergeant Francis O'Rourke arrived at LPD headquarters for the 7:00 p.m. to 7:00 a.m. shift. According to Lieutenant James Goral, prior to departing for the night, he advised

A-2062-23

Sergeant Pizzuti of the arrest and that Officer Montoya was completing the complaint with the assistance of another detective.[1]

Before he left LPD headquarters at the end of his shift, Officer Montoya placed the evidence locker key and remaining paperwork in a manila envelope.[2] Because Lieutenant Goral had already departed, Officer Montoya could not store the manila envelope and scale in his squad's locker. He consulted with Sergeant O'Rourke,[3] who permitted him to leave the manila envelope and digital scale on a shelf in the police department's communications room.

At approximately 9:00 p.m., while on patrol, Sergeant Pizzuti began to suffer from a migraine; a chronic issue Lieutenant Auteri acknowledged Sergeant Pizzuti had been dealing with "for a while." Despite taking medication,

---

[1] Sergeant Pizzuti testified he did not have any such conversation with Lieutenant Goral.

[2] The manila envelope, which had Officer Montoya's name, signature, badge number, and the case number on it, contained the following documents: "[a] Miranda warning, . . . health questionnaire[,] . . . suicide prevention forms, . . . prisoner property form, fingerprint card, fingerprint receipt[,] and the key to temporary evidence locker number two."

[3] According to the testimony of Lieutenant Vincent Auteri, Sergeant O'Rourke told Officer Montoya it "wasn't a good idea" to leave the manila envelope and scale in the communications room.

A-2062-23

Sergeant Pizzuti's symptoms continued to worsen, and he returned to LPD headquarters.

While reviewing reports, Sergeant Pizzuti noticed the manila envelope and scale in the communications room. According to Lieutenant Auteri, Sergeant Pizzuti "inquired about . . . the[] items . . . [and Sergeant] O'Rourke . . . told him they were [Officer Montoya's]." Because Sergeant Pizzuti believed the items were "definitely not supposed to be there," he placed them in his clear plastic lunch bag to take home with him. According to Sergeant Pizzuti, Sergeant O'Rourke was present in the communications room when he took the items, was sitting five or six feet from the shelf where Officer Montoya had placed them, and there was only one way to enter or exit the communications room.[4]

Sergeant Pizzuti testified he knew the items were not from any of the officers on his shift because they "weren't involved in anything that had a digital scale." Because materials had previously gone missing from the communications room, Sergeant Pizzuti explained he "didn't want to leave [the

_____

[4] Although Sergeant O'Rourke did not testify at the disciplinary hearings, he stated in the course of the internal affairs (IA) investigation he did not see Sergeant Pizzuti take the items: "I didn't see him remove anything to be honest with you."

A-2062-23

items] out.  [He] didn't want to be responsible if [they were not] there in the morning."  Believing the manila envelope and scale were not evidence, Sergeant Pizzuti planned to take the items home with him and return them at the start of his next 7:00 a.m. shift.

With the symptoms from his migraine continuing to worsen, Sergeant Pizzuti left LPD headquarters at approximately 1:45 a.m.[5]  He placed the plastic bag containing the manila envelope and digital scale on the front passenger seat of his car.  After arriving home, Sergeant Pizzuti placed the items on a couch in his bedroom and proceeded to fall asleep.

The next day, after arriving for the 7:00 a.m. to 7:00 p.m. shift, Lieutenant Goral and Officer Montoya discovered the items were no longer in the communications room.  They proceeded to search for the missing items and, after they failed to locate them, began contacting all the officers who had worked the previous night shift.  According to Sergeant Charles Giangeruso, he called and texted Sergeant Pizzuti "a couple times," but received no response.  Around

---

[5]  There is some dispute as to why Sergeant Pizzuti left early that night. According to Sergeant Pizzuti, he left because his migraine symptoms would not subside and he simply informed Sergeant O'Rourke he was leaving.  Sergeant O'Rourke, however, told IA investigators Sergeant Pizzuti left early because it was his birthday.

A-2062-23

11:10 a.m., Sergeant O'Rourke responded to one of Lieutenant Goral's texts and stated, "did you ask [Sergeant Pizzuti]?"

Because Sergeant Pizzuti had not replied to Sergeant Giangeruso, Lieutenant Goral proceeded to reference security footage from the night shift. After observing Officer Montoya place the items in the communications room, Lieutenant Goral witnessed Sergeant Pizzuti leave LPD headquarters holding a "white plastic bag under his left arm" with the manila envelope and scale visible. Sergeant Giangeruso then drove to Sergeant Pizzuti's house where he acknowledged he had the missing items. Sergeant Giangeruso told Sergeant Pizzuti to bring the items back to LPD headquarters, Sergeant Pizzuti complied, and returned the missing items to Lieutenant Goral. According to Lieutenant Auteri, when Sergeant Pizzuti returned the items to Lieutenant Goral he said, "oh, [Sergeant O'Rourke] didn't tell you I had them?"

The next day, Sergeant Pizzuti received a phone call from Police Benevolent Association (PBA) President Jeffrey Regent and PBA delegate Sergeant O'Rourke, who informed him the Township would terminate his employment as a result of the incident unless he attended a rehabilitation facility

A-2062-23

in Florida.[6]  Sergeant Pizzuti remained at the Florida facility for twenty-eight or twenty-nine days before returning to New Jersey.

In January 2020, Lieutenant Auteri was assigned to conduct an IA investigation into Sergeant Pizzuti's conduct.  During his investigation, Lieutenant Auteri reviewed the surveillance footage and interviewed Sergeant Pizzuti, Sergeant O'Rourke, Officer Montoya, Lieutenant Goral, and Sergeant Giangeruso.  Lieutenant Auteri issued a report on April 30, 2020, in which he concluded "Sergeant Pizzuti had violated department rules and regulations[,] and he had violated the policy on evidence and property control."

Chief of Police Richard Jarvis reviewed Lieutenant Auteri's report, agreed with his findings, and sought Pizzuti's termination.[7]  On May 5, 2020, Sergeant Pizzuti received a Preliminary Notice of Disciplinary Action alleging the following violations:  (1) Code of Ethics (LPD Rule and Regulation 1:5); (2) Standards of Conduct (LPD Rule and Regulation 3:1.1); (3) Loyalty (LPD Rule and Regulation 3:1.2); (4) Neglect of Duty (LPD Rule and Regulation 3:1.7);

---

[6]  Although the record does not make clear exactly why Pizzuti was told he had to attend a rehabilitation facility, he admitted he received treatment for anxiety and depression.

[7]  Although it is unclear from the record what sanctions Sergeant O'Rourke and Officer Montoya received for their actions, Chief Jarvis testified they were both disciplined.

8

(5) Obedience to Laws and Regulations (LPD Rule and Regulation 3:1.11); (6) Absence from Duty (LPD Rule and Regulation 3:2.3); (7) Relief (LPD Rule and Regulation 3:2.8); (8) Truthfulness (LPD Rule and Regulation 3:5.8); (9) Truthfulness (LPD Rule and Regulation 3:8.5); (10) Sick on Duty (LPD Rule and Regulation 4:3.3); (11) Unauthorized Absence (LPD Rule and Regulation 4:3.4); (12) Evidence and Property Control (LPD Policy); (13) Conduct Unbecoming a Public Employee (N.J.S.A. 40A:14-147); (14) Truthfulness (N.J.S.A. 40A:14-147); and (15) Neglect of Duty (N.J.S.A. 40A:14-147).

A hearing officer held hearings on February 19, April 16, April 21,[8] June 16, September 8, and September 30, 2021. On February 6, 2022, the hearing officer issued a written report and recommendation sustaining all charges except those related to absenteeism. Noting both parties agreed discipline was appropriate, the hearing officer concluded Sergeant Pizzuti's termination was warranted. In support of this determination, the hearing officer noted four instances in which he believed Sergeant Pizzuti testified untruthfully:

> 1. Sergeant Pizzuti lied about telling Sergeant O'Rourke why he was leaving.
>
> 2. Sergeant Pizzuti lied about the reasons he removed the items from the police department.

---

[8] Defendants did not include a transcript of the April 21, 2021 hearing in the appellate record.

3. Sergeant Pizzuti lied about whom the items belonged to.

4. Sergeant Pizzuti lied about not looking in or reading the envelope but knowing the envelope did not contain money.

The hearing officer also concluded Sergeant Pizzuti's

conduct raise[d] serious questions about his integrity, judgment, and role as a supervisor. For example, while taking the items to protect the Lyndhurst police officer(s) responsible for leaving them in violation of the policies is incredible, Sergeant Pizzuti's motive raise[d] serious questions about what other policy violations he buried by not reporting other suspected violations to internal affairs[.]

Relying on our Supreme Court's decisions in In re Herrmann, 192 N.J. 19 (2007), and In re Carter, 191 N.J. 474, 484 (2007), the hearing officer also found the doctrine of progressive discipline was not applicable. He concluded termination was appropriate as "it was proven by the Township that Sergeant Pizzuti's sufficiently egregious misconduct, combined acts of insubordination, poor judgment, and false statements during the investigatory interview and evidentiary hearing violated the trust required to serve as a law enforcement officer." In a Final Notice of Disciplinary Action, Mayor and Commissioner of Public Safety Robert Giangeruso adopted the hearing officer's recommendations and terminated Sergeant Pizzuti's employment.

10

Pizzuti subsequently filed a complaint in the Law Division, seeking de novo review of his termination pursuant to N.J.S.A. 40A:14-150. By order dated February 2, 2024, the court vacated Sergeant Pizzuti's termination, imposed a twenty-one-day suspension for the conceded charge of conduct unbecoming a police officer, and explained its reasoning in a comprehensive thirty-three page written decision.

After summarizing the testimony elicited throughout the hearings and articulating the applicable law, the court found "the record strongly suggest[ed] that the decision to fire Sergeant Pizzuti preceded the report of Lieutenant Auteri and the decision of Chief Jarvis to accept the charges and the [h]earing before [the hearing officer]." In support of this finding, the court noted Sergeant O'Rourke and Regent informed Sergeant Pizzuti he would be fired before any IA investigation had been conducted. Further, the court found Chief Jarvis was unqualified to properly evaluate the IA report, and "[h]is testimony that he failed to further investigate the conclusions drawn by the report, consider progressive discipline, or make any inquiry into Sergeant Pizzuti's file, [made] the conclusion that Sergeant Pizzuti's termination was a foregone conclusion unavoidable."

With respect to the charges the hearing officer sustained against Sergeant Pizzuti, the court first found the Township failed to satisfy its burden on the charges of untruthfulness. Specifically, the court explained "[t]here [was] no basis in the record for a finding of an intentional, material misrepresentation on the part of Sergeant Pizzuti." For example, the court concluded the record did not establish Sergeant Pizzuti lied to Sergeant O'Rourke:

> Sergeant O'Rourke's testimony indicated he did not care why Sergeant Pizzuti was leaving. The sum of the testimony of both officers indicate[d] Sergeant O'Rourke knew the items had been left out by Officer Montoya against his advice. He also would have seen Sergeant Pizzuti leaving with the items[,] which were clearly visible through the clear plastic bag Sergeant Pizzuti was carrying them in. This is made clear by the testimony that he asked if those looking for the items had asked . . . Sergeant Pizzuti[] about them.

The court also found the Township failed to carry its burden relating to the charge of a violation of the department's code of ethics as "[t]he record ha[d] no evidence of motive or mens rea of such a violation." The court further concluded the Township failed to establish a violation under the loyalty charge as "[t]he testimony of Lieutenant Auteri . . . [was] incomprehensible on the basis of this charge or why Sergeant Pizzuti should be found to have violated any loyalty." Finally, the court found the charges of neglect of duty were unsupported by the record because Sergeant Pizzuti believed the scale was not

evidence; Sergeant O'Rourke did not question Sergeant Pizzuti's taking of the items; and "the testimony of Sergeant Giangeruso[,] which stated the scale was not evidence because a photograph had been taken of it."  (Emphasis omitted).

On the remaining charge of conduct unbecoming a police officer, to which Sergeant Pizzuti conceded, the court concluded a twenty-one-day suspension without pay was the appropriate penalty.  It explained, "[i]n not affirming the [h]earing [o]fficer's recommendation of termination[,] the court disagree[d] with the [h]earing [o]fficer's conclusion that [twenty-three] years of exemplary and award-winning service are wiped out by the facts on these charges."

Specifically, the court rejected the hearing officer's conclusion that the doctrine of progressive discipline should not be applied:  "The long employment and stellar record of Sergeant Pizzuti make progressive discipline applicable here. . . . His award-winning service in the [DEA] and his public service should not have been dismissed out of hand on one incident, which he fully admitted to and did not involve any violation of criminal law."[9]  It also concluded the

---

[9] The court declined to address the Township's argument that the court may be without authority to fashion a remedy, should it impose any discipline less than termination, because the New Jersey Attorney General may deny Sergeant Pizzuti a license to serve as a law enforcement officer.  The court explained it would "not engage in speculation regarding 'what ifs' and deals only with the facts that are before it based upon the record below.  The court[,] however[,

hearing officer "failed to consider that many of the charges were duplicative and should have been merged for purposes of assessing penalty."

Defendants filed a Notice of Appeal. After communicating with the Appellate Clerk regarding the finality of the court's February 2 order, defendants moved for leave to appeal, which we granted.[10]

II.

Defendants contend "the trial court's decision must be reversed[,] and [Sergeant] Pizzuti's termination must be reinstated." They first argue the court erred in applying the doctrine of progressive discipline. Relying on Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980), and Carter, 191 N.J. 474, they assert "even when a law enforcement officer does not possess a prior disciplinary record after many unblemished years of employment, the seriousness of an offense may nevertheless warrant a significant penalty." Noting the heightened standard law enforcement officers are held to regarding

---

could discern] no basis on this record for the Attorney General to deny Sergeant Pizzuti a license to serve as a law enforcement officer."

[10] Although it is not entirely clear from the record whether Sergeant Pizzuti is currently working for the LPD, at a hearing before the court on February 22, 2024, the parties informed the court the Township was "leaning toward having [Sergeant Pizzuti] be on paid administrative leave while the appeal of [the court's] ruling [was] pending."

disciplinary actions, see Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560 (App. Div. 1965), and "the importance of maintaining discipline in a paramilitary organization such as a police department," defendants maintain the conceded charge of conduct unbecoming a police officer "alone warrants [Sergeant Pizzuti's] termination."

With respect to the conceded charge and the court's determination a twenty-one-day suspension without pay was the appropriate quantum of discipline, defendants contend:

> The trial court utterly failed to consider that, on this one . . . conceded charge alone, [Sergeant] Pizzuti's termination was justified and should have been upheld. [Sergeant] Pizzuti's conduct clearly violated the law, placed the entire arrest into jeopardy, placed the LPD and Lyndhurst into legal jeopardy, adversely affected the morale of the LPD with respect to the confidence that other members of the LPD now have in [Sergeant] Pizzuti, destroys the public respect for the LPD, offends publicly accepted standards of decency[,] and clearly does not uphold the law [Sergeant] Pizzuti swore to uphold.

Further, defendants argue the court failed to properly address the statutory misconduct charge under N.J.S.A. 40A:14-147.[11]    Because the record

---

[11] We note it is unclear what "statutory misconduct" charge to which defendants refer.   Sergeant Pizzuti faced several charges under N.J.S.A. 40A:14-147: conduct unbecoming a public employee, truthfulness, and neglect of duty.

"establishe[s] the nature and severity of [Sergeant] Pizzuti's misconduct in taking the items that did not belong to him, . . . [t]he trial court's decision with respect to the misconduct charge must be reversed[,] and [Sergeant] Pizzuti's termination must be reinstated."

Additionally, based on a directive issued by the Attorney General's office addressing the Supreme Court's decisions in Brady v. Maryland, 373 U.S. 83, 87 (1967), and Giglio v. United States, 405 U.S. 150 (1972), defendants maintain the Attorney General's guidelines will likely prevent them from rehiring Sergeant Pizzuti. This is "because his admitted misconduct and its disposition may have to be shared with a court and defense counsel in any matter in which [Sergeant] Pizzuti might be required to testify and renders him ineligible to perform his duties."

Pursuant to Office of the Attorney General, Administrative Directive No. 2019-6, Directive Establishing County Policies to Comply with Brady v. Maryland and Giglio v. United States 5 (Dec. 4, 2019) (Directive), Brady/Giglio material involving a law enforcement officer that must be disclosed includes:

> vi. A sustained finding, or judicial finding, that an investigative employee intentionally mishandled or

_____

Sergeant Pizzuti conceded the charge of conduct unbecoming a public employee, and defendants address the truthfulness and neglect of duty charges separately in their merits brief.

16

destroyed evidence. Generally, law enforcement agencies and investigative employees should disclose findings or allegations that relate to substantive violations concerning: (1) the intentional failure to follow legal or departmental requirements for the collection and handling of evidence, obtaining statements, recording communications, and obtaining consents to search or to record communications, and obtaining consents to search or to record communications; (2) the intentional failure to comply with agency procedures for supervising the activities of a cooperating person; and (3) the intentional failure to follow mandatory protocols with regard to the forensic analysis of evidence;[]

vii. Any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation.

[(Internal footnote omitted).]

The Directive further provides disclosable Brady/Giglio material concerning an investigative employee's intentional mishandling of evidence "does not include incidents deemed by a supervisory authority to be a mistake or done in error without intention, even in cases where the incident was sustained." Id. at 5 n.2.

Defendants further argue the court erred in dismissing the neglect of duty charges. Specifically, they contend Sergeant "Pizzuti neglected his duty to adhere to normal standards of conduct in carrying out his duties as a supervisory officer." They assert "LPD[] policy prohibited [Sergeant] Pizzuti from taking the items home, irrespective of whether they were evidence, sensitive case

17

documents, or prisoner property. Removing items from the LPD without authorization or permission is egregious misconduct."

Defendants further maintain the court erred in finding Sergeant Pizzuti was not guilty of untruthfulness. Citing the testimony of Lieutenant Goral, who explained he could no longer trust Sergeant Pizzuti to handle evidence, defendants argue they can no longer have faith Sergeant Pizzuti will be able to carry out "one of the most fundamental obligations of a police officer, the preservation of materials collected in a criminal matter." They maintain, "[a]t the very least, [Sergeant] Pizzuti was dishonest when he suggested that [Sergeant] O'Rourke knew that he had taken the items." Defendants argue due to the thoroughness of the investigatory process, "and the hearing officer's ability to assess the credibility of the evidence and the witness testimony," the court should have afforded some level of deference to his conclusions.

III.

Pursuant to N.J.S.A. 40A:14-150, an officer is entitled to a hearing, and if convicted of any charge, he may seek review in the Superior Court. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 355 (2013). As noted, the court's review is de novo. Ibid. It must provide "an independent, neutral, and unbiased" review of the disciplinary action, and make its own findings of fact. Id. at 357

18

(citing In re Phillips, 117 N.J. 567, 580 (1990)). "Although a court conducting a de novo review must give due deference to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling." Phillips, 117 N.J. at 579. Indeed, "[o]n reviewing the record de novo, the court must only make reasonable conclusions based on a thorough review of the record. That process might include rejecting the findings of the original tribunal, which are necessarily based on an assessment of the demeanor and credibility of witnesses." Id. at 580.

Our role in reviewing a de novo proceeding is limited. Id. at 579. "[W]e must ensure there is 'a residuum of legal and competent evidence in the record to support'" the court's decision. Ruroede, 214 N.J. at 359 (quoting Weston v. State, 60 N.J. 36, 51 (1972)). We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding[s]." Phillips, 117 N.J. at 579 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

Unless we "find[] that the decision below was 'arbitrary, capricious or unreasonable[,]' or '[un]supported by substantial credible evidence in the record as a whole,' the de novo findings should not be disturbed." Ibid. (third alteration in original) (quoting Henry, 81 N.J. at 580). On the other hand, we owe no

deference to the court's legal conclusions. Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 203 (1997) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

N.J.S.A. 40A:14-147 permits the removal of a police officer from their position for reasons including "misconduct . . . or disobedience of rules and regulations established for the government of the police department and force." Our Supreme Court has stated misconduct under the statute "need not be predicated on the violation of any particular department rule or regulation," but may be based merely upon the "'implicit standard of good behavior[,] which devolves upon one who stands in the public eye as the upholder of that which is morally and legally correct.'" Phillips, 117 N.J. at 576 (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960)).

"[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public . . . ." State v. Gismondi, 353 N.J. Super. 178, 185 (App. Div. 2002). Our court has long held police officers are subject to heightened standards of conduct. See, e.g., Twp. of Moorestown, 89 N.J. Super. at 566 ("[Officers] represent[] law and order to the citizenry and must present an image

of personal integrity and dependability in order to have the respect of the public . . . .").

Progressive discipline is a judicially created doctrine stemming from <u>West New York v. Bock</u>, 38 N.J. 500 (1962). There, the Court held a single instance of misconduct may not be cause for termination. <u>Id.</u> at 523. However, "numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty. Such conduct is particularly serious [by] . . . employees whose job is to protect the public safety . . . ." <u>Id.</u> at 522. The Court further held an employee's past record "may be resorted to for guidance in determining the appropriate penalty for the current specific offense." <u>Id.</u> at 523 (citing <u>Rushin v. Bd. of Child Welfare</u>, 65 N.J. Super. 504, 517 (App. Div. 1961)).

In <u>Carter</u>, the Court revisited the progressive discipline doctrine and held "progressive discipline [is not] a fixed and immutable rule to be followed without question. Instead, we have recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." 191 N.J. at 484. "[P]rogressive discipline is not a necessary consideration . . . when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for

continuation in the position, or when application of the principle would be contrary to the public interest." Herrmann, 192 N.J. at 33. Indeed, "the question for the courts is 'whether such punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Carter, 191 N.J. at 474 (quoting In re Polk, 90 N.J. 550, 578 (1982)) (internal quotation marks omitted).

Pursuant to these principles, we affirm the court's ruling as we are satisfied its decision to impose a twenty-one-day unpaid suspension rather than termination was not arbitrary, capricious, or unreasonable. Phillips, 117 N.J. at 579 (quoting Henry, 81 N.J. at 580). The record supports the court's finding that defendants failed to sustain their burden on the charges of untruthfulness.[12]

With respect to defendants' claim Sergeant "Pizzuti was dishonest when he suggested that [Sergeant] O'Rourke knew that he had taken the items," the record supports the court's conclusion that Sergeant O'Rourke "would have seen . . . [Sergeant] Pizzuti leaving with the items which were clearly visible through the clear plastic bag." That is, it is reasonable for Sergeant Pizzuti to assume

_____

[12] Although the hearing officer based his conclusion that Sergeant Pizzuti was guilty of untruthfulness on various grounds, in their briefs, defendants justify the untruthfulness charges on the allegation he "was dishonest when he suggested that [Sergeant] O'Rourke knew that he had taken the items."

Sergeant O'Rourke witnessed him leave with the items given the undisputed facts that Sergeant Pizzuti was five to six feet away from Sergeant O'Rourke and placed the items in a clear plastic bag. To the extent defendants contend Sergeant Pizzuti implied he informed Sergeant O'Rourke he took the items when he told Lieutenant Goral "oh, [Sergeant O'Rourke] didn't tell you I had them," we are satisfied there is sufficient support in the record for the court's conclusion there was "no basis in the record for a finding of an intentional, material misrepresentation on the part of Sergeant Pizzuti."

However, the court erred in finding defendants failed to establish the charges of neglect of duty. With respect to these charges, the court noted, "[o]f importance in this regard is the testimony of Sergeant Giangeruso[,] which stated the scale was not evidence because a photograph had been taken of it. . . . [H]is testimony makes clear the scale was not considered evidence by the Department." (Emphasis omitted).

Despite the fact individuals within the LPD may not have considered the scale evidence, that does not change the fact it was seized in connection with an arrest. Although Sergeant Pizzuti neglected his duty to properly maintain evidence by removing the manila envelope and scale from LPD headquarters, we are convinced the court's error was harmless, as the neglect of duty charges

arise out of the same conduct as the conceded charge, i.e., removing the items from LPD headquarters.

With respect to defendants' argument the court erred in applying the doctrine of progressive discipline, we are convinced it acted properly. While our Supreme Court has "recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record," Carter, 191 N.J. at 484, in our view, Sergeant Pizzuti's conduct does not rise to such a level.

Indeed, our Supreme Court has stated the ultimate test is "whether such punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Id. at 474 (quoting Polk, 90 N.J. at 578). Here, Sergeant Pizzuti made no attempt to secrete the items other than placing them in a clear plastic bag; there are no allegations he intended to steal the items; and Sergeant Pizzuti has never before been reprimanded for mishandling evidence. Although we acknowledge the seriousness of Sergeant Pizzuti's conduct, in light of his decades-long career and nominal disciplinary history, we are convinced his termination would be "so disproportionate to the offense, . . . as to be shocking to one's sense of fairness." Ibid. (quoting Polk, 90 N.J. at 578). To the extent defendants argue termination

24                                                                          A-2062-23

is the only appropriate penalty for Sergeant Pizzuti's conduct given the adverse effect his continued employment would have on LPD morale, we find that argument is belied by the fact that neither Officer Montoya nor Sergeant O'Rourke were terminated for their mishandling of the items or their involvement in the incident.

Further, we find unconvincing defendants' argument related to the Directive. As noted, the Directive provides potentially disclosable Brady/Giglio information includes "[a] sustained finding, or judicial finding, that an investigative employee intentionally mishandled or destroyed evidence." Admin. Directive No. 2019-6, at 5. Additionally, the Directive does not define disclosable Brady/Giglio material to "include incidents deemed by a supervisory authority to be a mistake or done in error without intention, even in cases where the incident was sustained." Id. at 5 n.2.

In light of the court's decision and our opinion, there is no longer a sustained finding Sergeant Pizzuti intentionally mishandled evidence. Similarly, with respect to that portion of the Directive addressing "allegation[s] of misconduct bearing upon truthfulness," id. at 5, we have concluded the court correctly found there was no basis in the record to sustain the charges of untruthfulness against Sergeant Pizzuti.

Finally, we are unpersuaded by defendants' contention the court should have afforded some level of deference to the hearing officer's conclusions. As N.J.S.A. 40A:14-150 makes clear, "[t]he court shall hear the cause de novo on the record below and may either affirm, reverse[,] or modify such conviction." See also Phillips, 117 N.J. at 580 ("To require a reviewing court to defer to the original findings would conflict with the fundamental purpose of a de novo proceeding under N.J.S.A. 40A:14-150: to ensure that a neutral, unbiased forum will review disciplinary convictions.").

Indeed, although the court "must give due deference to the conclusions drawn by the original tribunal regarding credibility," it need "only make reasonable conclusions based on a thorough review of the record, . . . [which] might include rejecting the findings of the original tribunal, which are necessarily based on an assessment of the demeanor and credibility of witnesses." Id. at 579-80. Here, Sergeant O'Rourke did not testify at the disciplinary hearings. Accordingly, there was no credibility determination on his part for the court to defer to. To the extent the court's conclusions and the inferences it drew from the record and witnesses' testimony differed from the hearing officer's, we are satisfied it made reasonable conclusions based upon its review of the record and find no reason to disturb its decision.

A-2062-23

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2062-23